PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JUSTIN MICHAEL WOLFE,
            *Petitioner-Appellant,*

v.

GENE M. JOHNSON, Director of the
Virginia Department of
Corrections,
            *Respondent-Appellee.*

No. 08-8

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(2:05-cv-00432-RAJ-JEB)

Argued: December 2, 2008

Decided: May 11, 2009

Before KING, SHEDD, and DUNCAN, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published
opinion. Judge King wrote the opinion, in which Judge Shedd
and Judge Duncan joined.

## COUNSEL

**ARGUED:** Michele Jill Brace, VIRGINIA CAPITAL REP-
RESENTATION RESOURCE CENTER, Charlottesville,

Virginia, for Appellant. Matthew P. Dullaghan, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** James M. Griffin, KING & SPALDING, L.L.P., Washington, D.C.; Daniel J. King, KING & SPALDING, L.L.P., Atlanta, Georgia, for Appellant. Robert F. McDonnell, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

---

**OPINION**

KING, Circuit Judge:

Justin Michael Wolfe, convicted of capital murder and sentenced to death in Virginia, appeals from the district court's dismissal of his 28 U.S.C. § 2254 petition for habeas corpus relief. We have granted Wolfe a certificate of appealability (the "COA") on four substantive claims: (1) that the jury was exposed to extraneous influences during the penalty phase deliberations (the "extraneous influence claim"); (2) that Wolfe's trial counsel was ineffective in moving to strike a qualified and potentially favorable venireman, and that the trial court erred in striking that venireman (the "venireman claim"); (3) that the prosecution failed to disclose exculpatory and impeachment evidence, in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963) (the "*Brady* claim"); and (4) that the prosecution presented false trial testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972) (the "*Giglio* claim"). Wolfe also contends that the district court erred in failing to address his claim of actual innocence, presented as a procedural "gateway" for the adjudication of otherwise defaulted substantive claims, under *Schlup v. Delo*, 513 U.S. 298 (1995) (the "*Schlup* issue"), and by declining to conduct an evidentiary hearing and to permit relevant discovery. As explained

below, we affirm on the extraneous influence claim and a sub-part of the venireman claim (the "venireman-counsel sub-part"); vacate on the *Brady* and *Giglio* claims, as well as on the balance of the venireman claim (the "venireman-court subpart"); and remand on the *Schlup* issue, the *Brady* claim, the *Giglio* claim, the venireman-court subpart, and for such other and further proceedings as may be appropriate.

## I.

In these § 2254 proceedings, the petitioner, Justin Wolfe, is an acknowledged marijuana dealer who was convicted in Virginia state court for his role in the 2001 murder-for-hire of his drug supplier, Daniel Petrole. Wolfe's conviction was primarily secured on the basis of evidence from the triggerman himself, another drug dealer named Owen Barber IV. Barber was the prosecution's key witness in Wolfe's capital trial and the only witness to provide any direct evidence regarding the "for hire" element of the murder offense and the involvement of Wolfe therein.[1] More than three years after Wolfe's trial, however, Barber executed an affidavit (the "Barber Affidavit") that repudiated his trial testimony and exculpated Wolfe from the murder-for-hire scheme.

The Barber Affidavit and several related affidavits were first submitted for judicial consideration in the district court in these § 2254 proceedings. Wolfe relies on these affidavits to establish the merits of some of his substantive claims, as well as to demonstrate his actual innocence under *Schlup* in order to excuse certain procedural defaults. Before assessing the substantive claims and the *Schlup* issue, we delineate and review the underlying facts as they were presented in Wolfe's 2002 trial in the Circuit Court of Prince William County, Virginia, and in subsequent proceedings.

---

[1]In exchange for his trial testimony, the Commonwealth dismissed its capital murder charge against Barber, and he pleaded guilty to non-capital murder. Barber was eventually sentenced to sixty years of imprisonment, of which twenty-two years were suspended.

## A.

Wolfe was indicted in Prince William County on May 7, 2001, and charged with hiring Barber to murder Petrole — a capital offense in Virginia[2] — and with using a firearm in the commission of a felony. On July 2, 2001, the grand jury indicted Wolfe on the additional charge of conspiring to distribute marijuana. These indictments were consolidated for trial, and Wolfe was tried over a two-week period in January 2002.

## 1.

### a.

The evidence presented at Wolfe's trial reflects that, at the time of Petrole's March 2001 murder, Wolfe was a nineteen-year-old marijuana dealer in northern Virginia. Wolfe dealt high-grade marijuana — referred to on the street as "chronic" — which Petrole had supplied to Wolfe since around November 2000. Wolfe made $10,000 to $15,000 a month from his drug business, and purchased between eight and eighteen pounds of marijuana from Petrole every two weeks. To finance their transactions, Wolfe and Petrole utilized an informal credit system known as "fronting." Under the fronting system, in exchange for a supply of marijuana, Wolfe would give Petrole a cash down payment and then pay the balance as cash was received from drug sales. Petrole tracked the debts that his customers owed him on what is called an "owe sheet." During their illicit business relationship, Wolfe's debts to Petrole reached as high as $100,000. An owe sheet found on Petrole's body reflected that Wolfe owed Petrole approximately $60,000.

---

[2]Virginia defines "capital murder," in pertinent part, as "[t]he willful, deliberate, and premeditated killing of any person by another for hire." Va. Code Ann. § 18.2-31(2).

Barber, then twenty-one years old, was also a drug dealer in northern Virginia. In contrast to Wolfe, Barber usually sold a lower grade of marijuana called "shwag," which he acquired from a supplier other than Petrole. Wolfe and Barber had been close friends since high school. Barber testified at trial that, in late February or early March 2001, he and Wolfe discussed "get[ting]" Wolfe's "chronic man" (Petrole), and that they actually followed Petrole to certain locations with the intention of killing him. J.A. 535-36.[3] No one else participated in these preparatory discussions or activities. Their plan came to fruition on March 15, 2001, when Wolfe informed Barber that Petrole would be doing a drug deal that night with Wolfe at the apartment of Wolfe's girlfriend, Regina Zuener. Barber and Wolfe agreed that Barber would follow Petrole home from the apartment and kill him.

Later that evening, Wolfe alerted Barber that Petrole was enroute to Zuener's apartment in Centreville, Virginia, and Barber invited his friend J.R. Martin to come along. Although Martin declined, he permitted Barber to drive Martin's red, four-door 1998 Ford Escort. Armed with a 9mm handgun he had purchased from his former roommate Jason Coleman, Barber drove the Escort to Zuener's apartment, parked at the end of a cul-de-sac, and waited alone. Inside the apartment, Zuener, Coleman, Coleman's wife, and another friend were with Wolfe. At about 9:40 p.m., Petrole entered the apartment with a duffel bag filled with ten to fifteen pounds of marijuana, packed in one-pound bags. According to Zuener, Petrole also carried a large sum of cash. After selling Wolfe about eight pounds of marijuana, Petrole exited the apartment and drove away. Wolfe and the others then went to a local nightclub.

Barber trailed Petrole through several Fairfax County neighborhoods, frequently updating Wolfe by cell phone.

---

[3]Citations herein to "J.A. " refer to the Joint Appendix filed by the parties in this appeal.

Ultimately, Barber followed Petrole to Petrole's townhouse near Bristow, Virginia. As Petrole parked his car, Barber "jumped out" of the Escort, approached Petrole, and rapidly fired ten rounds through the passenger-side window from a distance of about five or six feet, emptying the ammunition clip. J.A. 563. Barber then retreated to the Escort and sped away, throwing the firearm and gloves out the car window. Individuals in Petrole's townhouse heard the shooting and went outside to assist after Barber fled.[4]

After shooting and killing Petrole, Barber returned to his apartment and recounted to Martin what had occurred. Barber then called Wolfe, attempted to clean up Martin's car, changed clothes, and went with Martin to meet Wolfe at the local nightclub. Barber told Wolfe at the club that "it was done," to which Wolfe responded, "all right." J.A. 575. Wolfe gave Barber "a pound and a half hug" and ordered a round of drinks. *Id.* According to Barber, Wolfe commented that "we got to have a made cake now," which was slang for making a lot of money. *Id.* at 577. They also toasted to making their "rack of money." *Id.* In exchange for carrying out the murder scheme, Wolfe told Barber he did not have to pay for four pounds of marijuana that Wolfe had previously fronted him, gave Barber half-a-pound of chronic marijuana, forgave a $3000 debt, and promised Barber an additional $10,000 cash.

Martin's trial testimony largely corroborated Barber and offered circumstantial evidence supporting the prosecution's case. Martin testified that he had observed Barber and Wolfe talking alone for about fifteen minutes at the nightclub after Petrole's murder (although he said Barber "told [him] to go away" while they spoke), and that Wolfe bragged about making a lot of money and ordered Martin to keep quiet. J.A. 699.

---

[4]Police officers discovered $965 cash on Petrole's body and over $17,000 cash in a duffel bag in the trunk of his car. A subsequent search of Petrole's townhouse uncovered approximately $120,000 cash, 46 pounds of marijuana, and 4000 ecstasy tablets.

Additionally, the day after Petrole's death, Martin purchased marijuana from Wolfe. After Martin told Wolfe, "I know what you guys did," Wolfe forgave a $600 debt and fronted Martin $5000 worth of marijuana at a discount. *Id.* at 707-08.[5]

On March 18, 2001, Barber gave Martin $540 to repair damage to the Escort that occurred during Petrole's murder, and told Martin to have the work done in Virginia Beach. Refusing to assist Barber further, Martin reported what he knew about the Petrole murder to the authorities. The police thereafter searched Barber's apartment and questioned him. In a police station interview, Barber initially denied any involvement in Petrole's murder.

Barber thereafter went to Florida, and then by train to San Diego, California. From San Diego, he contacted his former girlfriend Jennifer Pascquirello, and asked her to obtain money from Wolfe and bring it to him in San Diego. Pascquirello testified that, after obtaining $1000 cash from Wolfe in Virginia, she drove to San Diego to meet Barber. As they hid out in a local motel, Barber related a version of the events surrounding Petrole's murder; that version implicated Wolfe and was consistent with Barber's trial testimony. Barber was arrested in San Diego by the federal authorities three weeks after Petrole's death, and was escorted back to Virginia.

b.

Wolfe testified in his own defense at trial and, with respect to Petrole's murder, contradicted the evidence of Barber and the other prosecution witnesses. From the witness stand, Wolfe admitted that he had dealt drugs for four or five years

---

[5]Wolfe was arrested by federal authorities in Florida on March 22, 2001, a week after Petrole's murder, and was released the next day. At trial, Wolfe testified that, although he had driven to Florida, he had already planned a March 23, 2001 return flight home, and that he had notified the police that he was taking the trip.

prior to Petrole's death; that he had conspired with others to distribute marijuana; that he had distributed more than a hundred pounds of marijuana in northern Virginia in his drug-dealing career; that he had discussed with friends the possibility of robbing a drug dealer; and that he had spoken with Barber by phone both before and after Petrole's killing. Wolfe also admitted selling marijuana to Martin the day after the Petrole murder, at a reduced price, after Martin said, "I know what you guys did."[6] Wolfe conceded to owing Petrole around $66,000 at the time of the murder, although such a debt was not uncommon in their drug-dealing relationship. Wolfe also testified that Barber had called him on March 19 or 20, 2001, to request money, which Wolfe refused. Wolfe denied any involvement in Petrole's death and theorized that Barber had testified falsely because he was angry at Wolfe for refusing to give him money after the murder, and for having had sex with Pascquirello.

2.

Two incidents concerning the trial jury are presented in these § 2254 proceedings. The first of these jury incidents occurred during the voir dire portion of the jury selection process and relates to the venireman claim. The second such incident occurred during the jury's deliberations in the trial's penalty phase and relates to the extraneous influence claim.

a.

The first jury incident — which underlies the venireman claim — occurred during the voir dire portion of the jury selection process. While questioning a panel of prospective jurors, the prosecution asked each potential juror whether he or she could impose the death penalty on Wolfe, even though

---

[6]Wolfe interpreted Martin's statement that "I know what you guys did" as meaning that Martin knew about Wolfe's drug dealing with Petrole, not that Wolfe was involved in the Petrole murder.

Barber, the triggerman, would receive a lighter sentence. One such venireman, Robert Mock, initially indicated that he could not. The prosecutor then asked Mock, "So you absolutely could not impose the death penalty in that certain case?" J.A. 70. He replied, "I don't think so." *Id.*

Thereafter, Wolfe's counsel sought to rehabilitate Mock and demonstrate to the trial court that Mock was qualified to serve as a juror. Wolfe's lawyer asked Mock,

> Is there a set of facts that could be presented to you — your testimony was before that if the shooter was not getting the death penalty, that you didn't think it was right for Mr. Wolfe to get the death penalty, or would there be circumstances where you could impose it?

J.A. 77. Mock responded, "Yes, there could be circumstances where I could." *Id.* When Wolfe's lawyer then asked Mock if he would "follow the law," Mock said, "Sure. Yeah." *Id.* Mock also agreed that he would weigh the evidence and that he had no "preconceived notions" about the facts. *Id.* The prosecution did not ask Mock any follow-up questions.

At the conclusion of voir dire, the prosecution moved to excuse for cause another prospective juror named Fields, who had consistently stated that he could not impose the death penalty under any circumstance. Wolfe's lawyers objected, but the trial court struck Fields from the venire. In apparent response to the trial court's dismissal of Fields, Wolfe's counsel moved to excuse Mock for cause. The pertinent exchange between counsel and the court on that request proceeded as follows:

> Defense counsel: Your honor?

> The Court: Yes, sir.

> Defense counsel: In that case, I would have a motion to strike Robert Mock. Mr. Mock stated that he could not impose the death penalty because the trigger man in this case, Owen Barber, had not received the death penalty.
>
> The Court: Mr. Ebert?
>
> Prosecutor: I don't object to that.

J.A. 91. Following this exchange with Wolfe's counsel, the trial court granted the motion and struck Mock for cause.

The venireman claim presented in these § 2254 proceedings challenges the constitutional effectiveness of Wolfe's trial counsel in moving to strike Mock from the venire, as well as the constitutional propriety of the court's decision to excuse Mock for cause. Thus, the venireman claim has two separate prongs, the venireman-counsel subpart and the venireman-court subpart. In the venireman-counsel subpart, Wolfe contends that his trial counsel was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), in moving to strike Mock, despite Mock's qualification for jury service and indications that he had "expressed sensitivity to at least one basis for exercising mercy and voting for life." Br. of Pet'r 73. Wolfe characterizes his counsel's act as one of frustration — a "fit of pique" — following the trial court's decision to strike venireman Fields. *Id.* at 68. Thus, Wolfe asserts, "[c]ounsel unreasonably allowed his frustration at the court's ruling to overcome his rational judgment, and this fell below the Sixth Amendment standard." *Id.* at 73.

In the venireman-court subpart, Wolfe asserts that the trial court contravened the Sixth and Fourteenth Amendments by striking venireman Mock from the jury panel, in that Mock was plainly able and qualified to serve as a juror. Wolfe maintains that, under the Supreme Court precedent of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), "the trial court had power to

exclude Mock for cause *only* if he was unqualified to serve." Br. of Pet'r 69. Furthermore, Wolfe contends that the court's error in striking Mock for cause is not subject to "harmless error" analysis because it resulted in a "structural error." *See id.* at 71 (citing *Gray v. Mississippi*, 481 U.S. 648, 668 (1987), and its progeny).

b.

The second jury incident — relating to the extraneous influence claim — occurred during the jury's penalty phase deliberations. Wolfe alleges that, during those deliberations, the trial jurors were exposed to extraneous influences that deprived Wolfe of his Sixth Amendment right to an impartial jury. In support of this claim, Wolfe relies on an affidavit from one of the trial jurors, Lorrie Beyerl, which was appended to Wolfe's state habeas corpus petition (the "Beyerl Affidavit").[7]

Two separate allegations of juror misconduct comprise the extraneous influence claim. The first allegation arises from Wolfe's contention that, during a lunch break, the jury foreman left the jury room and had a photograph of his teenage son enlarged. The foreman returned to the jury room with the enlarged photograph, waited until the deliberations had resumed, and placed the photograph on the exhibit table next to the autopsy photos of Petrole. According to the Beyerl Affidavit, the foreman then "asked the other jurors if [they] wanted that to happen to [their] sons." Beyerl Affidavit ¶ 7. Beyerl stated that, prior to the photograph being brought into the deliberations, the jury had voted 11-1 in favor of a life sentence. After the foreman's introduction of the photograph, the jury unanimously agreed to recommend a death sentence.

The second allegation contained in the extraneous influence claim arises from Wolfe's assertion that a juror repeatedly

---

[7]The Beyerl Affidavit is found at J.A. 2628-30.

spoke to his wife by cell phone from the jury room during the jury's deliberations. According to the Beyerl Affidavit, the juror and his family planned to start a vacation the next day, and the juror "was often on his cell phone with his wife telling her he didn't know if we would finish in time or not." Beyerl Affidavit ¶ 6. Although the Beyerl Affidavit does not speculate as to what the wife may have said to her husband, Wolfe maintains that there was a reasonable risk that the wife's phone statements impacted her husband's decisionmaking.

3.

The jury found Wolfe guilty of all three of the charged offenses — capital murder, using a firearm in the commission of a felony, and conspiring to distribute marijuana. At the conclusion of the trial's penalty phase, the jury recommended that Wolfe receive a death sentence. On June 28, 2002, the trial court accepted the sentencing recommendation and, as a result, sentenced Wolfe to death on the murder conviction, plus consecutive prison terms of three years and thirty years, respectively, on his firearm and conspiracy convictions.

Wolfe appealed directly to the Supreme Court of Virginia, raising thirty-seven substantive claims. Of the four substantive claims on which we granted the COA, Wolfe raised two generalized *Brady* claims to the state supreme court.[8] The court did not reach and address those *Brady* claims, however, ruling instead that Wolfe had waived such claims by failing to brief them. *See Wolfe v. Commonwealth*, 576 S.E.2d 471, 479-80 (Va. 2003). In disposing of Wolfe's direct appeal, the court affirmed his convictions and sentences, *see id.* at 490,

---

[8]In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *United States v. Bagley*, the Court recognized that the *Brady* rule includes the disclosure of material impeachment evidence. *See* 473 U.S. 667, 676 (1985).

and the Supreme Court of the United States denied certiorari, *see Wolfe v. Virginia*, 540 U.S. 1019 (2003).

### B.

On February 24, 2004, having been unsuccessful on direct appeal, Wolfe sought habeas corpus relief in the Supreme Court of Virginia, raising twenty-three substantive claims. In his state habeas corpus petition, Wolfe asserted two *Brady* claims, encompassing three subclaims of the *Brady* claim being pursued in these § 2254 proceedings, as well as the extraneous influence and venireman claims also pursued herein.

With regard to the two *Brady* claims, Wolfe first alleged that the prosecution had failed to disclose multiple deals it had made with its witnesses, and that certain of those witnesses got materially better deals from the prosecutors than had been represented to Wolfe and his counsel during the trial proceedings.[9] In the midst of his allegations regarding witness deals, Wolfe maintained that the prosecution had failed to disclose that it "interviewed [Jason] Coleman extensively before trial, and Coleman told [the prosecution] that Barber had confessed that he acted alone in the murder." J.A. 2484. Second, Wolfe asserted that the prosecution had failed to disclose to his trial counsel exculpatory and impeachment evidence regarding triggerman Owen Barber's changing testimony. Specifically, Wolfe claimed that Barber's version of events in his first interviews with the police in Virginia and California was inconsistent with his testimony at Wolfe's preliminary hearing. According to Wolfe, the prosecution's documentation of such inconsistencies — particularly notes of interviews and

---

[9]By pretrial order of December 14, 2001, the trial court required the prosecution to "timely provide, to the Defendant, all evidence as to guilt or in mitigation of punishment that is required to be disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny." *Commonwealth v. Wolfe*, No. 50489, slip op. at 1 (Va. Cir. Ct. Dec. 14, 2001).

other pertinent materials — constituted *Brady* material that was required to be disclosed to Wolfe's defense team before trial.

By order of March 10, 2005, the Supreme Court of Virginia dismissed Wolfe's state habeas corpus petition. *See Wolfe v. Warden*, No. 040125 (Va. Mar. 10, 2005) (the "State Habeas Decision").[10] The State Habeas Decision included the following pertinent rulings:

- The extraneous influence claim lacked merit because "there [was] no evidence properly before [the court] to support [Wolfe's] claim that an extraneous contact with or by a member of the jury took place and that such contact was about the matter pending before the jury." State Habeas Decision 34.

- The venireman claim lacked merit in part, and otherwise had been procedurally defaulted. The venireman-counsel subpart lacked merit because it "satsifie[d] neither the 'performance' nor the 'prejudice' prong of" *Strickland*, 466 U.S. at 687. State Habeas Decision 2. The venireman-court subpart had been procedurally defaulted because it could have been raised at trial and on direct appeal, but was not. *Id.* at 3.

- The *Brady* claim that the prosecution did not fully disclose the deals with its witnesses was "conclusional" because Wolfe had "failed to allege facts that establish how the Commonwealth violated its obligation to disclose impeachment evidence." State Habeas Decision 28. The *Brady* allegation concerning Coleman was not separately addressed.

---

[10]The State Habeas Decision is found at J.A. 2697-733.

- • The *Brady* claim regarding Barber's initial incon-
  sistent statements to the authorities had been pro-
  cedurally defaulted because it could have been
  raised at trial and on direct appeal, but was not.

Wolfe thereafter requested a rehearing in the Supreme
Court of Virginia on the State Habeas Decision, which was
denied. *See Wolfe v. Warden*, No. 040125 (Va. June 17,
2005). Wolfe again unsuccessfully petitioned for certiorari in
the Supreme Court of the United States. *See Wolfe v. True*,
545 U.S. 1153 (2005).

## C.

### 1.

On July 22, 2005, Wolfe filed notice of his intention to
seek federal habeas corpus relief in the Eastern District of
Virginia. On August 9, 2005, on the Commonwealth's
motion, the district court limited Wolfe's petition to seventy-
five pages and his reply brief to thirty pages. That same day,
the court referred the § 2254 proceedings to a magistrate
judge for a report and recommendation. On October 26, 2005,
Wolfe sought a waiver of the page limitation, which the dis-
trict court denied on November 2, 2005. Wolfe filed his initial
§ 2254 petition — limited to seventy-five pages — on
November 7, 2005 (the "Initial Petition"). The Initial Petition
sought relief on eight claims, including three of the substan-
tive claims on which we granted the COA (a *Brady* claim, as
well as the external influence and venireman claims).

### 2.

Several weeks after filing the Initial Petition, Wolfe's law-
yers secured the Barber Affidavit, which was executed on
December 14, 2005.[11] The following day, Wolfe filed an

---

[11]The Barber Affidavit is found at J.A. 2943-55.

amended petition for § 2254 relief (the "Amended Petition"),[12] along with an appendix of supporting materials (the "Appendix"). In addition to the Barber Affidavit, the Appendix included affidavits executed by Carl Huff and Jason Coleman, two men who had previously lived with Barber, which corroborated the Barber Affidavit. The Appendix also included affidavits from three other prosecution witnesses in the trial, who stated that their police interviews had been tape recorded, and the affidavit of Wolfe's investigator, Bob Lessemun, who asserted that the authorities possessed such recordings.

a.

In the Barber Affidavit, Owen Barber confessed to testifying falsely at Wolfe's trial and admitted that Wolfe was not involved in Petrole's murder.[13] Barber specifically stated that "Justin had nothing to do with the killing of . . . Petrole," and that he (Barber) "lied and implicated Justin because [he] felt that [he] had no other choice." Barber Affidavit ¶¶ 5, 7. "The prosecution and my own defense attorney," Barber maintained, "placed me in a position in which I felt that I had to choose between falsely testifying against Justin or dying." *Id.* ¶ 7.

In his affidavit, Barber swore to facts that directly contradicted his trial testimony. Barber asserted in his affidavit that, for unexplained reasons, he had simply intended to confront Petrole, not kill him. According to Barber, he had "collected information about Danny Petrole, such as where he lived," and contacted Wolfe "several times in the days before the shooting to ask when [Wolfe] would be receiving his next delivery of chronic from Danny Petrole." Barber Affidavit ¶¶ 9, 11. "Around dusk" on March 15, 2001, Barber met Wolfe at a local restaurant and again inquired into Wolfe's next

---

[12]The Amended Petition is found at J.A. 2829-915.

[13]The Barber Affidavit contains multiple handwritten corrections and notations, apparently made by Barber prior to executing it.

planned meeting with Petrole, expressing his desire to purchase chronic from Petrole. Wolfe responded that he would likely see Petrole that night. Following that meeting, Barber and J.R. Martin returned to Barber's apartment where, later that evening, Wolfe called to say that Petrole would be delivering drugs to Regina Zuener's apartment.

Barber swore in his affidavit that Martin thereafter drove him to Zuener's apartment, where they waited together for Petrole in Martin's Escort at the end of a cul-de-sac. From there, they followed Petrole from Zuener's apartment "to Fairfax and then to his own house." Barber Affidavit ¶ 19. Step-by-step, the Barber Affidavit recounts how Barber, wearing "a hooded sweatshirt with a kangaroo pocket in the front," gloves, and a baseball cap, exited Martin's car and approached Petrole by foot as Petrole parked his car. *Id.* ¶¶ 22, 23. As Barber walked up to Petrole's vehicle, he saw Petrole reach for the passenger side and believed that Petrole was reaching for the glove compartment to get a weapon. Panicking, Barber "pulled [his] gun out of [his] pocket and shot Danny Petrole." *Id.* ¶ 27. Barber "continued to panic and fired the rest of the bullets." *Id.* Barber then ran to the Escort, and with Martin driving, they sped away.

After returning home, Barber cleaned up the Escort and changed clothes. Shortly thereafter, he and Martin met with Wolfe at the nightclub, where they "drank and toasted the way that [they] always did." Barber Affidavit ¶ 34. "There was nothing unusual," Barber maintained, "about the toasts we made that night." *Id.* Nor did Barber recall telling Martin to leave them (Barber and Wolfe) alone. Barber swore in his affidavit that, in his trial testimony, he had "fabricated the content of many of the calls" with Wolfe on the night of Petrole's murder. *Id.* ¶ 36. He said that he "frequently called Justin five or six times daily," that the frequency of their calls that night was not out of the ordinary, and that the phone calls "had nothing to do with the shooting of Danny Petrole." *Id.* ¶¶ 35, 43.

The Barber Affidavit also detailed Barber's conversations with the authorities following his arrest. The affidavit reflects that, on the flight back to Virginia from California, the officers accompanying Barber "told [him] they already knew that Justin had hired [him] to kill Danny Petrole and that one of [them] would end up telling the story and the other one would end up with capital murder." Barber Affidavit ¶ 47. Barber insisted that the officers first raised the murder-for-hire story, and that they made similar statements to Barber the next day when he was being held in the Prince William County Jail. And, when Barber met with his court-appointed attorney, the lawyer mentioned that, if he testified against Wolfe, Barber would be spared his life. Over several days, police officers and Barber's attorney "kept trying to get [Barber] to provide them with proof of an agreement or a deal between [Wolfe and Barber] for murder. It was like they were beating a drum." *Id.* ¶ 52. Barber stated that, in exchange for his testimony against Wolfe, he was told that Jennifer Pascquirello would not be charged.

Ultimately, Barber recounted, he "agreed to testify against Justin because [he] did not want to face the death penalty," he was upset with Wolfe for "let[ting] him down" by not giving him money when he wanted to flee after the Petrole murder, and he wanted to help Pascquirello. Barber Affidavit ¶¶ 55, 56. Barber acknowledged in the affidavit that he "knew that they wanted to hear that I had been hired by Justin to kill Danny Petrole, so I made up a story based in part on the true events of that night, but with lies woven in to turn the story into a murder for hire." *Id.* ¶ 59. Barber also expressed concern to the prosecutors that his plea and testimony deal was being made orally, and was not in writing.

The Barber Affidavit also alleged that Martin had fabricated his trial testimony against Wolfe. Indeed, Barber maintained that prosecutors had conducted a joint preparation session with Barber and Martin — prior to their trial testimony — and Barber swore that he altered his trial testimony

to conform his version of the evidence against Wolfe to that of Martin.[14] Barber explained that, during this preparation session, he "told the false story [he] had told the police and J.R. Martin would correct points with which he disagreed," and that they "changed details until the stories were consistent . . . . Essentially, [they] both told lies until [they] had put together the story that prosecutors wanted to hear." Barber Affidavit ¶¶ 67, 68. Ultimately, Barber swore, "At Justin's trial, I told the story that J.R. Martin and I had agreed upon in the meeting with prosecutors." *Id.* ¶ 69.

Barber's affidavit then explained his motivation for recanting his trial testimony. "At the time of my arrest and the trial," he explained, "I figured that I would do anything to avoid the death penalty and to try to get myself out of the situation I had got myself into. I would tell prosecutors and the police what they wanted to hear." Barber Affidavit ¶ 70. Barber concluded by asserting that "Justin does not deserve to die for something he did not do," and that he "fe[lt] bad about the fact that an innocent man is on death row." *Id.* ¶ 74.

b.

Wolfe's lawyers also secured supporting affidavits from the two men who had previously resided with Barber, and included those affidavits in the Appendix filed with the Amended Petition. The first such affidavit was executed by Carl Huff, a former cellmate of Barber at Wallens Ridge State Prison (the "Huff Affidavit").[15] The Huff Affidavit, like the

---

[14]The Barber Affidavit was not the only time that Barber had described a joint preparation session with prosecutors. Prior to the December 14, 2005 Barber Affidavit, Barber executed an affidavit on October 28, 2005, detailing similar discussions with the police and prosecutors. *See* J.A. 2917-19.

[15]The Huff Affidavit is found at J.A. 2957-63. Notably, Barber stated in his affidavit,

Some years ago, I told my friend and ex-cellmate, Carl Huff, about Danny Petrole's death and recently he shared the story with

Barber Affidavit, was executed on December 14, 2005. Huff swore in his affidavit that, in 2003 — two years before the Barber Affidavit — Barber had admitted to Huff that he had killed Petrole for personal reasons and that he (Barber) had testified falsely against Wolfe at trial. Huff stated that, "[o]ver three or four months" while they were incarcerated together, Barber told Huff how "Wolfe was in no way involved in the shooting of Petrole." Huff Affidavit ¶¶ 5, 14. Huff detailed the events surrounding the Petrole murder and, despite Huff's having been separated from Barber during the year prior to its execution, the Huff Affidavit is consistent with the Barber Affidavit. And, according to Huff, he executed his affidavit despite his belief that doing so could hurt his chances for parole.

The other additional affidavit was executed by Jason Coleman on November 3, 2005 (the "Coleman Affidavit").[16] Although substantially shorter in length, the Coleman Affidavit corroborates the Barber and Huff Affidavits. Coleman swore that he "told prosecutors that Owen Barber had confessed to [him] that [Barber] acted alone in the murder of Danny Petrole." Coleman Affidavit ¶ 5. Coleman also stated that he had been interviewed by the police on a number of occasions with respect to Wolfe's case, that he had made these same statements to the police earlier, and that he believed those conversations had been recorded.[17]

---

Justin's counsel. I am not upset with him for doing that. In fact, I have felt like my hands were tied so that I could not tell the true story about Justin, yet I wanted the story told.

Barber Affidavit ¶ 73.

[16]The Coleman Affidavit is found at J.A. 2940.

[17]No police recordings of witness interviews have ever been disclosed to Wolfe's defense attorneys, either in conjunction with his trial or in the post-conviction proceedings. Indeed, the Commonwealth does not acknowledge that such recordings exist.

c.

Wolfe also submitted to the district court an affidavit from his investigator, Bob Lessemun (the "Lessemun Affidavit").[18] Lessemun explained that, between August and November 2005, he "investigated and/or interviewed most of the primary witnesses who testified in [Wolfe's trial,] as well as additional people who have knowledge about the events surrounding Petrole's death." Lessemun Affidavit ¶ 4. Lessemun stated that he, along with one of Wolfe's lawyers, had interviewed Barber around August 9 and 10, 2005. During that interview, Barber confessed to acting alone in killing Petrole and admitted that the murder was actually a robbery gone awry. Lessemun swore that "Barber said that if Petrole had been cooperative, Barber might have simply robbed him." *Id.* ¶ 6. Lessemun also stated that Barber told him that many of his conversations with the police had been recorded.

The Lessemun Affidavit also describes Lessemun's interview with Brenda Walburn, a then-Prince William County Police sergeant who had been involved in the investigation of the Petrole murder. According to Lessemun, Walburn acknowledged that "in her investigation of Petrole's death, she tape recorded most of her witness interviews. She said that more than forty (40) tapes were made and are still in police possession." Lessemun Affidavit ¶ 55. Lessemun stated that Walburn refused to give him the tapes.

3.

As noted, on December 15, 2005 — before the Commonwealth had answered the Initial Petition — Wolfe filed the Amended Petition and the separate supporting Appendix. Based on the affidavits contained in the Appendix, the Amended Petition added a substantive "actual innocence" claim under *Herrera v. Collins*, 506 U.S. 390 (1993) (the

---

[18]The Lessemun Affidavit is found at J.A. 2924-34.

"*Herrera* claim"); raised the procedural *Schlup* issue; expanded upon the existing *Brady* claim; and raised the *Giglio* claim.[19] The Amended Petition continued to allege the extraneous influence and venireman claims.

As set forth in the Amended Petition, the *Brady* claim encompasses four subclaims. It alleges that the prosecution had failed to timely and fully disclose the following: (1) deals made with prosecution witnesses (the "*Brady*/deals subclaim"); (2) evidence that Owen Barber's story had changed substantially over time (the "*Brady*/Barber subclaim"); (3) exculpatory statements made by Jason Coleman (the "*Brady*/Coleman subclaim"); and (4) the existence of over forty audiotaped interviews with prosecution witnesses (the "*Brady*/audiotapes subclaim"). The *Giglio* claim asserts that, as a result of the joint preparation session with its key witnesses, Barber and J.R. Martin, the prosecution had improperly coordinated their versions of the relevant evidence. Thus, their testimony created the false impression that their separate — but consistent — versions of the events had neither been coached nor coordinated.

With respect to Wolfe's assertion of actual innocence, the Amended Petition specifies that, the day before it was filed, "two separate sources [(Barber and Carl Huff)] confirmed what Wolfe has maintained throughout the history of this case: that he had nothing to do with the murder of Petrole." Amended Petition 12. In support of his assertion, Wolfe explained that "Owen Barber, the prosecution's star witness

---

[19]Wolfe's *Giglio* claim is premised upon the Supreme Court's decisions in *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). *Napue* reaffirmed the long-standing principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. at 269. *Giglio* further recognized that the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'" and, as such, violates due process. 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

in the Commonwealth's case against Wolfe and the only witness to tie Wolfe to the alleged murder-for-hire scheme, recanted his trial testimony that Wolfe hired him to kill Petrole." *Id.* The Amended Petition, in discussing Wolfe's assertion of actual innocence, presented both the substantive *Herrera* claim and the procedural *Schlup* issue. Wolfe alleged therein that "[t]he affidavit of Barber and the corroborating affidavits of Carl Huff and Jason Coleman reveal the events that actually led up to the murder of Petrole and exonerate Wolfe." *Id.* at 13.

In conjunction with his filing of the Amended Petition, Wolfe requested the district court to reset the schedule of the proceedings and allow the Commonwealth thirty additional days to answer the Amended Petition. He also requested the court to expand the record to include the Barber and Huff Affidavits. Nevertheless, on December 19, 2005, four days after Wolfe filed the Amended Petition, the Commonwealth answered the Initial Petition.[20] Then, on December 23, 2005, the Commonwealth requested the magistrate judge to strike the Amended Petition on procedural grounds. Deferring its ruling on the motion to strike, the magistrate judge, on January 5, 2006, ordered Wolfe to detail the differences between the Initial Petition and the Amended Petition, explain why an amendment was necessary, and make clear why the additional supporting materials in the Appendix could not have been included with the Initial Petition.

On January 19, 2006, Wolfe complied with the magistrate judge's order by filing a pleading styled as a "*PRAECIPE*," explaining that the primary differences between the Initial Petition and the Amended Petition were that the Amended Petition (1) expanded the existing *Brady* claim, and (2) added two new substantive claims (the *Giglio* and *Herrera* claims),

---

[20]In having never answered the Amended Petition, the Commonwealth has therefore neither admitted nor denied any of Wolfe's allegations predicated on the materials contained in the Appendix.

and the procedural *Schlup* issue. He stated that an amendment was necessary because the facts contained in the Barber Affidavit "affect multiple claims," and that the additional supporting materials could not have been included with the Initial Petition because "Barber's affidavit was not reasonably available at the time the original petition was filed," as "Barber was not prepared to sign an affidavit until December 14." J.A. 3033-34.

In April 2006, five months after executing his affidavit, Barber sought to recant the sworn statements contained therein. In an unsworn, handwritten letter directed to Wolfe's lawyers, Barber claimed that he had testified truthfully in Wolfe's trial, and that he had lied in the Barber Affidavit. In a single, seven-sentence paragraph, Barber stated, "The truth was already told by me when I testified in court at Justin's trial. I wish I could help Justin, but lieing is not the way." J.A. 3044.[21] Wolfe's lawyers promptly provided a copy of Barber's letter to the district court and requested an evidentiary hearing to assess the obvious credibility issues being presented. They also requested that the court authorize discovery on whether the prosecution had complied with its *Brady* obligations.

4.

On September 22, 2006, the magistrate judge entered an order in which he again deferred ruling on the Commonwealth's request to strike the Amended Petition. *See Wolfe v. Johnson*, No. 2:05-cv-00432 (E.D. Va. Sept. 22, 2006).[22] The magistrate judge denied Wolfe's motion to expand the record to include the Barber and Huff Affidavits, however, stating that they were "not essential to the petition before the court."

---

[21]Neither Huff nor Coleman have sought to recant their affidavits, which corroborate the Barber Affidavit.

[22]The magistrate judge's September 22, 2006 order is found at J.A. 3095-96.

*Id.* at 2. By that same order, the magistrate judge declined to consider the exhibits appended to the Amended Petition because they were outside the permissible ambit of the seventy-five page limitation imposed by the district court on Wolfe's petition.[23] On October 10, 2006, Wolfe filed objections to those rulings.

Nearly a year later, on August 7, 2007, the magistrate judge issued his Report and Recommendation, in which he declined to conduct an evidentiary hearing and recommended that the district court dismiss Wolfe's § 2254 petition. *See Wolfe v. Johnson*, No. 2:05-cv-00432 (E.D. Va. Aug. 7, 2007) (the "Report").[24] Regarding the Barber Affidavit and other Appendix materials that Wolfe had submitted with the Amended Petition, the Report explained that they "have not been, and will not be, considered by this Court." Report 40.[25]

The Report concluded that Wolfe's § 2254 claims either lacked merit, had been procedurally defaulted, or both. More specifically, the pertinent claims were disposed of as follows:

---

[23]The district court's August 9, 2005 order limited Wolfe's § 2254 petition to seventy-five pages, and directed that it "be otherwise in compliance" with Rule 7(F)(3) of the court's local rules. *See Wolfe v. True*, No. 2:05-cv-00432 (E.D. Va. Aug. 9, 2005). Rule 7(F)(3) governs the length and format of certain civil submissions in the Eastern District of Virginia, but it expressly excludes "affidavits and supporting documentation" from its scope. Additionally, the district court did not indicate that the page limitation encompassed affidavits such as those in the Appendix.

[24]In the Report, which is found at J.A. 3106-71, the magistrate judge considered both the Initial and the Amended Petitions. *See* Report 27 ("It is the Court's intention to respond to the issues in the original and amended petitions.").

[25]Despite asserting in the Report that the Appendix materials would not be considered, the magistrate judge nevertheless considered them, rejecting the *Herrera* claim on the basis that the Barber, Huff, and Coleman Affidavits were not credible. *See* Report 58-59. The magistrate judge thus implicitly modified, *sub silencio*, his initial decision to exclude the Appendix.

- According to the Report, the extraneous influence claim failed on its merits. The showing of the juror photo was not an attempt to introduce outside influence, but instead "reflects the concern of a juror who spent two weeks away from home while sitting on the jury of this case." Report 60. Additionally, the phone call from a juror to his wife during deliberations "deserves no merit" because any conclusion that the juror's wife may have been trying to influence the outcome of the deliberations was speculative. *Id.*

- On the venireman claim, the Report concluded that the venireman-counsel subpart lacked merit, and the venireman-court subpart had been procedurally defaulted.[26]

- On the four *Brady* subclaims, the Report concluded that "[i]n the absence of any evidence to support [Wolfe's] claims, the *Brady* claims are without merit and should be DISMISSED." Report 43. Furthermore, the Report explained that "the doctrine of procedural default will bar a federal habeas petition when a prisoner fails to meet a state procedural requirement." *Id.* at 39.

    – According    to    the    Report,    the

---

[26]In assessing the venireman claim, the Report appears to have confused its subparts. The Report stated, inversely to the state supreme court, that the venireman-counsel subpart had been procedurally defaulted, and that the venireman-court subpart lacked merit. Then, in explaining its proposed ruling on the venireman-court subpart, the Report explained why Wolfe's trial counsel had not been constitutionally ineffective. For our purposes, we assume this error was inadvertent and construe it as such. In any event, the mistake appears to have been corrected by the district court in its disposition of this matter. The district court ruled that the venireman-counsel subpart lacked merit, and the venireman-court subpart was procedurally defaulted.

*Brady*/deals subclaim lacked merit because it was "[c]ompletely unsupported and highly speculative." Report 42.

– The Report deemed the *Brady*/Barber subclaim to be without merit. It explained that "Barber was called at trial, cross-examined extensively, and remains the most direct evidence of what happened on the night of the murder," and that "[t]here is nothing that [Wolfe] has alleged that fairly draws into question whether Barber was a credible witness at trial or whether [Wolfe] lost any evidence which would have made a difference in this case." Report 42.

– The *Brady*/Coleman subclaim was determined by the Report to be without merit and procedurally defaulted. On the merits, "Coleman was available to each side following the murder and before trial, but he was never called as a witness by either side." Report 42. On the procedural default, the Report stated, "No claim has been presented to any Virginia court." *Id.*

– The Report concluded that the *Brady*/audiotapes subclaim was also procedurally defaulted. It stated that "the audiotape claim has never been presented to the Virginia courts and argued at any level." Report 43.

• Next, the Report concluded that the *Giglio* claim had been procedurally defaulted and lacked

merit. On the procedural default, the *Giglio* claim had not been presented in state court. On the merits, the Report observed that "[w]ithout a single shred of evidence that this Court may properly consider, [Wolfe] leaps to the conclusion that the Commonwealth encouraged the two witnesses to lie and put them on the witness stand so the lies could be told." Report 43.

• Finally, the Report concluded that the substantive claim of actual innocence under *Herrera* lacked merit. The magistrate judge expressed his belief that "Barber was as truthful as he has ever been when he told the jury how and why he killed Petrole and the specific role [Wolfe] played in the murder." Report 59.

The Report did not address whether Wolfe's procedural defaults were excused under the actual innocence "gateway" (i.e., the *Schlup* issue) or under the separate "cause and prejudice" standard.[27]

On October 10, 2007, Wolfe filed a lengthy series of objections to the Report.[28] As it was obliged to do, the district court then assessed the Report de novo, as challenged by Wolfe's

---

[27]A procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier*, 477 U.S. 478, 488 (1986), and (2) that "errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions," *United States v. Frady*, 456 U.S. 152, 170 (1982).

[28]Wolfe's objections to the Report, as filed on October 10, 2007, spelled out four "General Objections" and ten "Objections to Specific Claims." J.A. 3174. Among his "General Objections," Wolfe asserted that the magistrate judge had failed to consider whether his procedural defaults were excused, and that the judge had improperly resolved material factual disputes without conducting an evidentiary hearing.

objections. The court issued its resulting decision on February 11, 2008, by which it adopted the Report as its own and dismissed Wolfe's § 2254 petition. *See Wolfe v. Johnson*, No. 2:05-cv-00432 (E.D. Va. Feb. 11, 2008) (the "Federal Habeas Decision").[29] Concluding that the magistrate judge had committed no error in the Report, the Federal Habeas Decision ruled, inter alia, as follows:

- The extraneous influence claim lacked merit because Wolfe had "failed to establish that unauthorized contact was made with the jurors because [Wolfe] has complained about the alleged actions of the jurors themselves." Federal Habeas Decision 21-22.

- The venireman claim was without merit in part, and had otherwise been procedurally defaulted. Specifically, the venireman-counsel subpart was without merit because Wolfe's counsel struck venireman Mock for "tactical reasons." Federal Habeas Decision 24. The venireman-court subpart had been procedurally defaulted because it "was found waived by the Supreme Court of Virginia on direct appeal." *Id.*

- The *Brady* claim (comprised of the four *Brady* subclaims) was insufficient to warrant relief, as there was "no error in the Magistrate Judge's determination that there were no *Brady* violations." Federal Habeas Decision 18. Furthermore, "to the extent that [Wolfe] ha[d] not previously raised any portion of a *Brady* claim, the claim [was] procedurally defaulted." *Id.* at 16.

- The *Giglio* claim had been procedurally defaulted and failed on its merits. Wolfe's "allegation of

---

[29]The Federal Habeas Decision is found at J.A. 3232-63.

false trial testimony arranged by prosecutors is an invention that does not provide adequate basis for [Wolfe's] discovery request or support for his defaulted substantive claim." Federal Habeas Decision 20.

- The Report's *Herrera* determination was correct because Wolfe "ha[d] not created a 'truly persuasive demonstration of actual innocence' as contemplated in *Herrera*." Federal Habeas Decision 15.

- The Appendix was properly excluded as exceeding the page limitation on his § 2254 petition, because "[Wolfe] did not limit his appendix to the record upon which the decisions of the state courts were based. Instead, [he] attempted to use his appendix to present new arguments." Federal Habeas Decision 8. Also, "because a determination of whether a state court unreasonably applied a legal principle must be assessed in light of the record the state court had before it, the Magistrate Judge was correct not to consider [Wolfe's] two-volume appendix to the habeas petition." *Id.*

- The Report properly resolved material factual disputes without conducting an evidentiary hearing. Wolfe "points to no specific factual disputes in his general objections," and because "[s]ignificant weight must be given to the record and deference must be given to the reasonable findings of the state court," an evidentiary hearing was not warranted. Federal Habeas Decision 10-11.

Despite these rulings, the Federal Habeas Decision is incomplete. The district court, like the magistrate judge in the Report, neither reached nor addressed the procedural *Schlup*

actual innocence issue. The court, however, considered (and rejected) Wolfe's contention that his procedural defaults were excused under the "cause and prejudice" standard. Additionally, in denying Wolfe's request for an evidentiary hearing, the court did not reach or assess the threshold issue of whether Wolfe had exercised diligence in pursuing his substantive claims or his assertion of actual innocence in the state court proceedings. And, although the court would not consider the Appendix materials with regard to the *Brady* and *Giglio* claims, it did consider the Barber, Huff, and Coleman Affidavits in disposing of the *Herrera* claim.

Wolfe thereafter filed a motion to alter or amend the judgment, which the district court denied by order of May 20, 2008. On June 18, 2008, Wolfe filed his notice of appeal with respect to the Federal Habeas Decision. On September 12, 2008, we granted Wolfe the COA on his extraneous influence, venireman, *Brady*, and *Giglio* claims.[30] We possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## II.

In disposing of a § 2254 habeas corpus petition, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") substantially constrain our review of an underlying state court decision. *See* 28 U.S.C. § 2254(d). Pursuant thereto, federal habeas relief may be awarded only if (1) the state court adjudication of the claim on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* A state court's decision is "contrary to" clearly established federal law only if it is "substantially different" from the relevant

---

[30]Wolfe did not request a COA on the *Herrera* claim.

Supreme Court precedent; it is "an unreasonable application of" clearly established federal law only if it is "objectively unreasonable." *Williams (Terry) v. Taylor*, 529 U.S. 362, 405, 409 (2000).

A state prisoner seeking § 2254 habeas corpus relief faces several procedural obstacles. Importantly, the petitioner should have presented his claims in state court before raising them in federal court under § 2254. *See* 28 U.S.C. § 2254(b)(1)(A). If his claims were not presented in state court, they will generally be procedurally defaulted, and the federal court will be unable to adjudicate them. *See Vinson v. True*, 436 F.3d 412, 417 (4th Cir. 2006). A § 2254 petitioner may, however, overcome such a procedural default by showing "cause and prejudice" or by establishing that his confinement constitutes "a miscarriage of justice." *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977); *McNeill v. Polk*, 476 F.3d 206, 211 (4th Cir. 2007) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). A proper showing of "actual innocence" is sufficient to satisfy the "miscarriage of justice" requirement. *See House v. Bell*, 547 U.S. 518, 536-37 (2006).

We review de novo a district court's denial of relief in § 2254 habeas corpus proceedings. *See Barbe v. McBride*, 521 F.3d 443, 452 (4th Cir. 2008). We review for abuse of discretion, however, such a court's decision not to conduct an evidentiary hearing. *See Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006). A court necessarily abuses its discretion when it makes an error of law. *See id.* Finally, in assessing whether a § 2254 claim has been "properly dismissed without an evidentiary hearing or discovery," we must evaluate its underlying allegations pursuant to the principles of Federal Rule of Civil Procedure 12(b)(6). *Id.*

III.

The claims and issues assessed herein are fairly grouped into three categories. The first category is comprised of those

claims — the extraneous influence claim and the counsel sub-part of the venireman claim — that Wolfe maintains (without depending on the materials in the Appendix to the Amended Petition) were incorrectly rejected on the merits. The second category concerns Wolfe's reliance on the procedural *Schlup* issue — an issue never addressed by the district court — for a merits resolution of his procedurally defaulted claims. And the third category relates to Wolfe's contention that the district court is obliged to conduct an evidentiary hearing, as well as permit relevant discovery, on the *Schlup* issue and the *Brady* and *Giglio* claims.

### A.

We begin with our first category of claims and issues, which encompasses the extraneous influence claim and the counsel subpart of the venireman claim. Neither relates to the Appendix, and both claims were disposed of on their merits in the state supreme court and in the district court. As explained below, we affirm the district court's denial of § 2254 relief on these claims.

### 1.

First of all, the extraneous influence claim arises from Wolfe's assertion that the jury's penalty phase deliberations were improperly influenced by two events: (1) the jury foreman's introduction of an enlarged picture of his teenage son (the "photograph allegation"); and (2) a juror's telephone call to his wife (the "telephone allegation"). The Supreme Court has recognized that "[i]n a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954).

In *Remmer*, the Court concluded that a criminal defendant's claim that one of his trial jurors had been influenced by a

bribe offer required judicial inquiry. *Remmer*, 347 U.S. at 229-30. The Court has consistently emphasized, however, that a judicial examination of *all* evidence tending to impeach a jury's verdict is not mandated. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (holding that evidentiary hearing on allegations of juror's drug and alcohol use during deliberations was unnecessary). In its jury influence jurisprudence, the Court has clearly distinguished between *external* jury influences, on the one hand, and *internal* jury influences, on the other. *Compare Parker v. Gladden*, 385 U.S. 363, 363-64 (1966) (bailiff referred to defendant as "wicked fellow" before certain jurors) (external influence), *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965) (key testifying police officers fraternized with jurors) (external influence), *and Remmer*, 347 U.S. at 229 (external influence), *with Tanner*, 483 U.S. at 127 (internal influence). Although external jury influences necessitate a thorough judicial inquiry, no such obligation is imposed with regard to an internal jury influence. Importantly, we recently recognized that

> [u]nder clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.*, information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, . . . or (2) is an outside influence upon the partiality of the jury, such as private communication, contact, or tampering with a juror.

*Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006) (internal citations and quotation marks omitted).

a.

Before assessing the merits of Wolfe's extraneous influence claim, we must first determine the appropriate standard to be applied in our review. On May 6, 2004, prior to issuing the State Habeas Decision, the Supreme Court of Virginia, on

the Commonwealth's motion, struck the Beyerl Affidavit from Wolfe's state habeas petition. The court did not, however, enunciate its reasons for so ruling. Then, in the State Habeas Decision, the court rejected the extraneous influence claim on the ground that "[t]here [was] no evidence properly before [the court] to support petitioner's claim that an extraneous contact with or by a member of the jury took place and that such contact was about the matter pending before the jury." State Habeas Decision 34.

We have heretofore recognized that, "[u]nder AEDPA, a federal court must defer to a state court's resolution of a claim that has been 'adjudicated on the merits.'" *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(d)). "Conversely," as we further explained, "where a state court has not considered a properly preserved claim on its merits, a federal court must assess the claim de novo." *Id.* In these § 2254 proceedings, Wolfe asserts that AEDPA does not constrain our review of the extraneous influence claim because "the state court . . . did not adjudicate this claim on the merits." Br. of Pet'r 57. Wolfe thus insists that, in these circumstances, our review of the extraneous influence claim must proceed de novo.

AEDPA controls our review of the extraneous influence claim, however, because the state supreme court decided that claim on its merits. That is, although the State Habeas Decision did not articulate the legal principles that guided its analysis, or identify the legal precedents upon which it relied in striking the Beyerl Affidavit, the court implicitly ruled that the affidavit did not provide Wolfe with a cognizable basis for relief. We have explained that, "[w]hen the state court decision being reviewed by a federal habeas court fails to provide any rationale for its decision, we still apply the deferential standard of review mandated" in AEDPA. *Fullwood v. Lee*, 290 F.3d 663, 677 (4th Cir. 2002) (citing *Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir. 2000) (en banc)). In order to conduct a proper AEDPA analysis, however, we must indepen-

dently review the relevant record and the applicable law. *See id.*

b.

Turning to the merits of the extraneous influence claim, we separately examine, under the guidance of AEDPA, the two allegations asserted therein. First, on the photograph allegation, Wolfe has failed to show that the state court's ruling was "contrary to," or "an unreasonable application of," clearly established federal law. 28 U.S.C. § 2254(d)(1). Indeed, the court could reasonably have concluded that the photograph was unrelated to any issue in the jury deliberations, and that it was not the type of problematic influence — "private communication, contact, or tampering . . . with a juror" — identified by the Court in *Remmer*. *See* 347 U.S. at 229. Therefore, applying the AEDPA standard of review, Wolfe is not entitled to § 2554 relief on the photograph allegation of the extraneous influence claim.

Likewise, the State Habeas Decision did not unreasonably conclude that a juror's telephone call to his wife during deliberations was not an external jury influence. We have recognized that "[e]xtra-judicial contact with a juror . . . is 'presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties.'" *Fullwood*, 290 F.3d at 678 (quoting *Remmer*, 347 U.S. at 229). For the presumption to apply, however, a § 2254 petitioner must show both that an "unauthorized contact was made and that it was of such a character as reasonably to draw into question the integrity of the verdict." *Id.*

As the Report observes, Wolfe's assertion that the telephone conversation between the juror and his wife constituted an external influence is speculative. Put simply, the record is void of any showing of what the juror's wife may have said on the telephone, or what the effect of her words might have

been. On this record, therefore, the state court's conclusion that Wolfe failed to show a prejudicial influence on the jury's deliberations was not objectively unreasonable. As a result, we must also defer to the State Habeas Decision's ruling on this aspect of the extraneous influence claim.[31]

2.

We turn next to the merits of the counsel subpart of the venireman claim. In disposing of the venireman-counsel subpart, the State Habeas Decision ruled that Wolfe was unable to show how his trial counsel had been constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Court held that a habeas petitioner claiming constitutional ineffectiveness must show that his counsel's performance was deficient and that prejudice resulted. *See* 466 U.S. at 687.

The State Habeas Decision's rejection of the counsel subpart of the venireman claim was neither contrary to, nor an unreasonable application of, clearly established federal law. After correctly identifying the controlling precedent, the state supreme court ruled that Wolfe was unable to show that his counsel's trial performance was constitutionally deficient. Although venireman Mock had initially expressed "a position seemingly sympathetic to [Wolfe's] situation," he later "retreated" from that position. State Habeas Decision 2. "This sort of equivocation by a prospective juror," the state supreme court explained, "puts counsel in a quandary about whether to leave the person on the venire or to remove him. In such circumstances, it cannot be said as a matter of law that counsel's

---

[31]With respect to the extraneous influence claim, Wolfe also maintains that the Supreme Court of Virginia's decision to strike the Beyerl Affidavit denied him due process and equal protection, as guaranteed by the Fourteenth Amendment. Because the state supreme court's disposition of the extraneous influence claim on the merits was not "contrary to" or "an unreasonable application of" clearly established law, the Fourteenth Amendment allegation would accord Wolfe no relief and, thus, is moot.

decision to remove the person is erroneous." *Id.* at 2-3. The State Habeas Decision's ruling on the counsel subpart of the venireman claim was not objectively unreasonable, and we thus affirm the district court's rejection of that subpart.

### B.

We next turn to our second category of claims and issues, focusing on the district court's failure to address the procedural *Schlup* issue. Wolfe relies on *Schlup* in seeking a resolution on the merits of his procedurally defaulted substantive claims. As explained below, we must remand the *Schlup* issue for a proper assessment in the district court.

### 1.

In his Amended Petition, Wolfe alleged that his showing of actual innocence, supported by the Barber, Huff, and Coleman Affidavits, entitled him to two separate forms of relief, the first substantive and the second procedural. First, Wolfe relied on the Supreme Court's decision in *Herrera v. Collins*, 506 U.S. 390 (1993), and contended that his actual innocence of the murder-for-hire offense warranted substantive relief, because the execution of an innocent accused would contravene the Eighth Amendment. Second, Wolfe asserted that, under the Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995), his showing of actual innocence was sufficient to serve as a procedural gateway for the adjudication of any otherwise defaulted constitutional claims in these § 2254 proceedings.

Significantly, the district court failed to reach and adjudicate the procedural *Schlup* issue. And, put simply, a sound analysis of the *Schlup* issue is essential to properly resolve these § 2254 proceedings, because a ruling in Wolfe's favor would allow his procedurally defaulted claims to be addressed on their merits.

2.

In its *Schlup* and *Herrera* decisions, the Supreme Court has established and utilized separate and distinct legal standards, and those decisions control a federal court's review and disposition of actual innocence claims that are pursued in § 2254 proceedings. *See Schlup*, 513 U.S. at 313-17 (comparing *Schlup* and *Herrera* standards). In *Herrera*, the Supreme Court in 1993 rejected a state prisoner's substantive actual innocence claim. Herrera had not alleged any constitutional error in connection with his trial; rather, his habeas petition rested entirely on a claim of actual innocence. Writing for the Court plurality, Chief Justice Rehnquist "assume[d], for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417. The Chief Justice recognized, however, that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* Assuming such a right exists, he concluded, Herrera had failed to make the threshold showing. *See id.*

On the other hand, the *Schlup* actual innocence standard for gateway procedural relief relies on a less-stringent — though nevertheless rigorous — burden. In *Schlup*, the Court recognized in 1995 that a showing of actual innocence can serve as a "gateway," that is, such a showing may be utilized by a § 2254 petitioner to secure the adjudication of his otherwise defaulted constitutional claims. Unlike Herrera, Schlup was not challenging an error-free trial on the basis of actual innocence alone; he also sought to utilize actual innocence as a "gateway" for pursuing his procedurally defaulted constitutional claims. *See Schlup*, 513 U.S. at 315. As Justice Stevens explained, in writing for the Court majority, "[f]or that reason, Schlup's conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial." *Id.* at 316. Thus, "Schlup's evidence of inno-

cence need carry less of a burden." *Id.* The Court concluded that a gateway showing of actual innocence "must establish sufficient doubt about [the petitioner's] guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Id.*

As a result, a § 2254 petitioner asserting actual innocence as a procedural gateway is obliged to demonstrate that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Schlup*, 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). "To establish the requisite probability," the Court explained, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* The *Schlup* mandate thus ensures that a gateway actual innocence assertion must be "truly extraordinary," and its appropriate application thus provides "a meaningful avenue by which to avoid a manifest injustice." *Id.*[32]

Of importance, a § 2254 petitioner is entitled to have a *Schlup* actual innocence issue addressed and disposed of in the district court. *See Bousley v. United States*, 523 U.S. 614, 623 (1998) (remanding *Schlup* issue when district court failed to address it); *see also Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (en banc) (instructing district courts to resolve all claims presented in § 2254 petitions).[33] In ruling on Wolfe's petition, the district court addressed and rejected his *Herrera* claim — predicated upon its facial assessment of the

---

[32]Under *Schlup*, the evidence necessary for a showing of actual innocence must be "new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." 513 U.S. at 324. As the Court has explained, however, this list is nonexhaustive. *See House v. Bell*, 547 U.S. 518, 537 (2006) ("[T]he habeas court's analysis is not limited to such evidence.").

[33]In resolving this appeal, we leave open the issue of whether, in an appropriate circumstance, a *Schlup* actual innocence issue could be adjudicated in the first instance on appeal.

Amended Petition and the Barber, Huff, and Coleman Affidavits — concluding that Wolfe had not presented a "'truly persuasive demonstration of actual innocence.'" Federal Habeas Decision 15 (quoting *Herrera*, 506 U.S. at 417). The court failed, however, to address the *Schlup* issue. Because the *Schlup* decision mandates a less-stringent showing for an award of gateway relief than *Herrera* requires for an award of substantive relief, Wolfe might satisfy *Schlup* and yet fail to meet the "extraordinarily high" mandate of *Herrera*.[34]

The district court's failure to adjudicate the *Schlup* actual innocence issue constitutes an error of law, and thus an abuse of its discretion. On remand, the court is thus obliged to assess Wolfe's contention of actual innocence and determine, pursuant to *Schlup*, whether "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327.[35]

## C.

Finally, we turn to our third category of claims and issues — those relating to whether Wolfe is entitled to an evidentiary hearing on the *Schlup* issue and the *Brady* and *Giglio* claims. As explained below, § 2254(e)(2) proscribes a district court from conducting an evidentiary hearing in a § 2254 proceeding in certain circumstances. Wolfe contends, however, that § 2254(e)(2) does not bar such a hearing in this case, and that he is in fact entitled to one. As explained below, the dis-

---

[34]Having utilized the Barber, Huff, and Coleman Affidavits in resolving the *Herrera* claim, the court should also assess them with regard to the *Schlup* issue.

[35]Wolfe contends on appeal that the district court erred in deeming certain of his claims to be procedurally defaulted. And, as we previously observed, any procedural defaults could be excused through a showing of "cause and prejudice" or actual innocence. Because the district court could grant Wolfe relief on the *Schlup* issue, we need not now address its rulings on procedural defaults or cause and prejudice. The court is free, however, to revisit such rulings on remand.

trict court failed to make any fact-based threshold determinations regarding Wolfe's request for an evidentiary hearing, and we thus remand for further proceedings in that regard.[36]

1.

Wolfe maintains that an evidentiary hearing is necessary to properly resolve the *Schlup* issue and the *Brady* and *Giglio* claims. In rejecting Wolfe's request for such a hearing, the district court explained that "[s]ignificant weight must be given to the record and deference must be given to the reasonable findings of the state court." Federal Habeas Decision 10 (citing *Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007)). The court then observed that "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Id.* at 14. Because the "state-court trier of fact conducted a full hearing and reliably found the relevant facts," the Federal Habeas Decision explained, an evidentiary hearing was not required. *Id.*

After explaining that an evidentiary hearing was not warranted, the district court proceeded to address Wolfe's claim of actual innocence under *Herrera*. Notwithstanding its initial pronouncement that it would not consider the Appendix, the court, in denying Wolfe's *Herrera* claim, facially assessed the Amended Petition and the Barber, Huff, and Coleman Affidavits.[37] Indeed, the court concluded that those affidavits were

---

[36]Wolfe also asserts that he is entitled to conduct discovery on certain of his substantive claims. Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that a district court may authorize discovery upon a showing of "good cause" by a § 2254 petitioner. Such "good cause" will exist when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). In the context of assessing the evidentiary hearing issue, the district court will be obliged to also address the discovery question.

[37]In his Amended Petition, Wolfe alleged that, predicated on the newly discovered evidence contained in the Barber, Huff, and Coleman Affida-

not credible. Beginning with the Barber Affidavit, the court observed that Barber had therein contradicted his trial testimony, and that recantations are "'looked upon with utmost suspicion.'" Federal Habeas Decision 12 (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)). Concerning the Huff Affidavit, the court explained that "the hearsay contained in Carl Huff's affidavit would not have been admitted or considered in an evidentiary hearing and there was no legal basis to give it weight." *Id.* at 14. This credibility assessment, the court explained, was bolstered by the fact that Huff was a convicted felon, serving a long prison sentence. *See id.* With respect to the Coleman Affidavit, the court opined that an evidentiary hearing was not warranted because Coleman had been available to both the prosecution and the defense after Petrole's murder and during Wolfe's trial. *See id.* at 15.

In order to properly review the district court's reasoning on this issue and analyze Wolfe's contention that an evidentiary hearing should have been conducted, we must first examine the legal principles that could preclude such a hearing. If such a hearing is not precluded, the district court must then decide whether, in these circumstances, Wolfe is entitled to an evidentiary hearing.

2.

Initially, § 2254(e)(2) precludes a district court from conducting an evidentiary hearing on a federal habeas claim if the petitioner "failed to develop the factual basis of [the] claim in State court proceedings." If the court determines that the peti-

---

vits, he was actually innocent of Petrole's murder. The Amended Petition summarizes the contents of those affidavits and spells out his allegation of actual innocence in four pages of specifics. *See* Amended Petition 11-14. More particularly, Wolfe alleges that "because Barber's original, false testimony served as the lynchpin that tied Wolfe to the murder of Petrole, now that Barber has told the truth there is no direct evidence tying Wolfe to Petrole's murder." *Id.* at 14.

tioner so "failed," it must then assess whether he nevertheless has satisfied one of the statute's two exceptions.[38]

In *Williams (Michael) v. Taylor*, Justice Kennedy — writing for a unanimous Supreme Court — interpreted and explained the meaning of the opening clause of § 2254(e)(2). *See* 529 U.S. 420, 431 (2000).[39] Emphasizing Congress's use of the word "failed," the Court explained that, "[i]n its customary and preferred sense, 'fail' connotes some omission, fault, or negligence on the part of the person who has failed to do something." *Id.* "To say a person has failed in a duty," the Court observed, "implies he did not take the necessary steps to fulfill it. He is, as a consequence, at fault and bears responsibility for the failure." *Id.* at 432. Thus, as Justice Kennedy emphasized, "[u]nder the opening clause of

---

[38]The provisions of § 2254(e)(2) that control whether a district court is barred from conducting an evidentiary hearing in a § 2254 proceeding are as follows:

> (2)   If the [petitioner] has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the [petitioner] shows that —

> (A)   the claim relies on —

>> (i)   a new rule of constitutional law . . . ; or

>> (ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and

> (B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

[39]On April 18, 2000, two factually unrelated decisions styled *Williams v. Taylor* were handed down by the Supreme Court. One of those decisions related to a § 2254 petitioner named Michael Williams, and the other related to a § 2254 petitioner named Terry Williams. We refer to these two decisions as *Williams (Michael)* and *Williams (Terry)*. The *Williams (Michael)* decision controls our assessment of the § 2254(e)(2) issues.

§ 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is *lack of diligence*, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* (emphasis added). Applying any other standard, the Court explained, would defy congressional intent. *See id.* ("We conclude Congress used the word 'failed' in the sense just described. Had Congress intended a no-fault standard, it would have had no difficulty in making its intent plain.").

Justice Kennedy's unanimous opinion then provided the lower federal courts with guidance on the proper assessment of whether a petitioner has exercised diligence in developing the factual basis for his claim in state court:

> Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend . . . upon whether those efforts could have been successful.

*Williams (Michael)*, 529 U.S. at 435. Importantly, the Court further explained that, in determining whether a petitioner has been diligent, "[t]he question is not whether the facts could have been discovered but instead whether the prisoner was diligent in his efforts." *Id.*; *see also Conaway*, 453 F.3d at 589 (applying *Williams (Michael)* to determine whether § 2254(e)(2) bar applied); *Robinson*, 438 F.3d at 367 (same). If the petitioner was diligent in pursuing the claim in state court, he cannot have "failed to develop" the claim, and § 2254(e)(2) does not bar an evidentiary hearing. *Williams (Michael)*, 529 U.S. at 430; *see also Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) (recognizing § 2254(e)(2) as inapplicable absent lack of diligence); *Channer v. Brooks*, 320 F.3d 188, 199 (2d Cir. 2003) (same). Pursuant to *Williams (Michael)*, a § 2254 petitioner bears the burden of demonstrat-

ing that he was diligent in pursuing his claims in state court. *See* 529 U.S. at 440.[40]

If the district court decides that Wolfe "failed to develop" his claims in state court, then it must assess whether he satisfies either of § 2254(e)(2)'s exceptions. Those exceptions are satisfied if the petitioner shows his claim relies on either "a new rule of constitutional law," or "a factual predicate that could not have been previously discovered through the exercise of due diligence," and prejudice resulted. 28 U.S.C. § 2254(e)(2)(A)-(B).[41]

In *Conaway v. Polk*, we addressed, inter alia, a district court's denial of relief to a § 2254 petitioner who was pursuing a claim of juror bias. *See* 453 F.3d at 589. That decision is informative here. The district court had declined to conduct an evidentiary hearing because Conaway had not, in the court's view, pursued his juror bias claim in state court and had not alleged sufficient facts in the § 2254 proceeding to entitle him to relief. *See id.* After assessing the matter, we remanded the bias claim for an evidentiary hearing.

---

[40]The term "claim" in § 2254(e)(2) could arguably be deemed to refer only to a substantive — rather than a procedural — ground for relief. *See* 28 U.S.C. § 2254(d) (discussing availability of habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings"). An actual innocence contention under *Schlup* is procedural in nature, and as such, could be construed as not constituting a "claim" under § 2254(e)(2). *See Sibley v. Culliver*, 377 F.3d 1196, 1207 n.9 (11th Cir. 2004); *see also Goldblum v. Klem*, 510 F.3d 204, 246 (3d Cir. 2007) (Pollak, J., dissenting). We reserve judgment on whether § 2254(e)(2) applies to the *Schlup* issue. On remand, the district court could conclude that § 2254(e)(2) does not otherwise apply to Wolfe because he has diligently pursued his claims.

[41]The *Williams (Michael)* decision explained that the opening clause of § 2254(e)(2) has an entirely different focus than the "due diligence" exception to the evidentiary hearing bar in § 2254(e)(2)(A)(ii). Where the opening clause examines a petitioner's effort to develop his claim in state court, "[t]he statute's later reference to diligence [in § 2254(e)(2)(A)(ii)] pertains to cases in which the facts could not have been discovered, whether there was diligence or not." *Williams (Michael)*, 529 U.S. at 435.

Importantly, in *Conaway* we assessed whether the petitioner had, pursuant to the opening clause of § 2254(e)(2), "failed to develop" his claim in state court. We observed that Conaway had "reasonably attempted, in light of the information available to him at the relevant times, to investigate and pursue" his claim in state court. *Conaway*, 453 F.3d at 589. As a result, Conaway's pursuit of habeas relief in state court did not lack diligence. Instead, "external causes" had prevented him from developing the pertinent facts: Conaway was never accorded the opportunity to develop his claim in state court, because witnesses had been reluctant to cooperate with Conaway's lawyers and because the state habeas court had denied an evidentiary hearing. *See id.* at 589-90.

Whether Wolfe exercised diligence in pursuing his *Schlup* assertion of actual innocence, or his substantive claims under *Brady* and *Giglio*, in the state court proceedings (or satisfies a § 2254(e)(2) exception) is a factual issue for the district court. The Federal Habeas Decision, however, failed to identify or rule on this issue. As such, the court erred in failing to address the diligence issue presented by § 2254(e)(2) and the *Williams (Michael)* precedent, and we must remand for a resolution thereof.[42]

### 3.

On remand, if the district court determines that § 2254(e)(2) does not proscribe an evidentiary hearing, the court must then assess whether Wolfe is entitled to one. Pursuant to our precedent, a § 2254 petitioner

---

[42]On the basis of this record and the allegations of the Amended Petition, it appears that Wolfe exercised diligence in pursuing the factual underpinnings of the *Schlup* issue. *See* Amended Petition 11-14. Indeed, it is not apparent that Wolfe's lawyers could or should have made an earlier discovery of the relevant underlying facts: specifically, there is no indication that Barber would have been willing to recant his trial testimony any earlier. Nevertheless, Wolfe must make a showing of diligence, which the Commonwealth may then seek to rebut.

who has diligently pursued his habeas corpus claim in state court is entitled to an evidentiary hearing in federal court, on facts not previously developed in the state court proceedings, if the facts alleged would entitle him to relief, and if he satisfies one of the six factors enumerated by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

*Conaway*, 453 F.3d at 582; *see also Walker v. True*, 399 F.3d 315, 327 (4th Cir. 2005) (remanding claim for evidentiary hearing).

In resolving the first issue on the question of entitlement to an evidentiary hearing — whether Wolfe alleges facts sufficient for an award of § 2254 relief — the district court must look to the Amended Petition, as well as the supporting Appendix. Indeed, Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts specifically contemplates that the adequacy of a § 2254 petition will be judged on the face of "the petition and any attached exhibits." *Cf. Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (recognizing that, under Federal Rules of Civil Procedure, district court may consider exhibits to complaint in assessing its sufficiency). Furthermore, the allegations of the Amended Petition and the Appendix should be evaluated pursuant to the principles of Federal Rule of Civil Procedure 12(b)(6). *See Conaway*, 453 F.3d at 582 ("In assessing whether a federal habeas corpus petition was properly dismissed without an evidentiary hearing . . . , we must evaluate the petition under the standards governing motions to dismiss made pursuant to Rule 12(b)(6) . . . ."). And, under the Rule 12(b)(6) standard, the court is "obliged to 'assume all facts pleaded by [the § 2254 petitioner] to be true.'" *Walker*, 399 F.3d at 319 (quoting *Rouse v. Lee*, 339 F.3d 238, 247 n.8 (4th Cir. 2003) (en banc)). In *Walker*, we vacated the dismissal of a mental retardation claim because the district court had failed to accept as true the allegations of the § 2254 petition. In so ruling, Judge Luttig carefully

explained that "whether Walker ha[d] 'stated a claim' in his petition depends on whether he ha[d] set forth facts that, if true, would demonstrate" he was entitled to relief. *Id.* at 320.

In assessing Wolfe's request for an evidentiary hearing, the district court failed to accept as true the allegations of his Amended Petition. *See Rouse*, 339 F.3d at 247 n.8 ("[W]e, like the district court, must assume all facts pleaded by Rouse to be true."). And the court prematurely rejected the credence and relevance of the Barber, Huff, and Coleman Affidavits. Regarding the Barber Affidavit, the court adhered to the proposition that an evidentiary hearing was precluded because that aspect of the allegation was based on a recantation. *See* Federal Habeas Decision 12 (citing *Johnson v. United States*, 487 F.2d 1278 (4th Cir. 1973)). Although *Johnson* urges caution when assessing the reliability of recantations, the recanting witness in *Johnson* was called to testify at an evidentiary hearing and was cross-examined. Indeed, we explained that "[w]here the circumstances surrounding the recantation suggest it is the result of coercion, bribery, or misdealing[,] the district court is justified in disregarding it." *Johnson*, 487 F.2d at 1279. This record simply does not, however, suggest any such "coercion, bribery, or misdealing." To the contrary, the fact that the supporting evidence is substantially predicated upon a recantation by the prosecution's lynchpin witness — the triggerman who provided the prosecution's only direct evidence implicating Wolfe in the murder-for-hire scheme — strongly suggests that an evidentiary hearing may be warranted.

As for the Huff Affidavit, the district court concluded that an evidentiary hearing was unnecessary because the affidavit contained inadmissible hearsay. *See* Federal Habeas Decision 14. The Supreme Court emphasized in *Schlup*, however, that a habeas court is not bound by the rules of evidence, carefully explaining that it must "focus the inquiry on actual innocence." *Schlup*, 513 U.S. at 327. As the Court explained,

> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.

*Id.* at 327-28. Thus, under controlling precedent, the evidence supporting a showing of actual innocence need not be admissible at trial, but merely relevant and previously unavailable. *See Royal v. Taylor*, 188 F.3d 239, 244 (4th Cir. 1999) (recognizing that court assessing actual innocence claim "is not bound by the rules of admissibility"). The court therefore erred in concluding that it could not consider the Huff Affidavit because it contains hearsay.

On the Coleman Affidavit, the district court adopted the magistrate judge's recommendation and ruled that the affidavit was not credible. The court reached its conclusion by observing that Coleman was available to the prosecution and the defense at trial, and that neither party called him as a witness. Thus, the court stated that "[n]either party trusted Coleman to be a helpful witness," and therefore his affidavit is not credible. Federal Habeas Decision 15. Far from viewing the Amended Petition and the Coleman Affidavit through the lens of Rule 12(b)(6), *see Conaway*, 453 F.3d at 582, the court inferred that Coleman was not credible solely because neither side called him as a witness at trial. That ruling was also an error of law.

Should the district court conclude on remand that Wolfe has alleged sufficient facts to entitle him to § 2254 relief, the court must then resolve the second issue on the question of entitlement to an evidentiary hearing — whether Wolfe satisfies any one of the six factors enumerated by the Supreme Court in its 1963 *Townsend* decision. Although Wolfe need

only satisfy one of these factors, at least three appear to be applicable here:

> (1)  the  merits  of  the  factual  dispute  were  not resolved in the state hearing; . . . (4) there is a substantial allegation of newly discovered evidence; [and] (5) the material facts were not adequately developed at the state-court hearing.

*Townsend*, 372 U.S. at 313.[43]

In  summary,  if  the  district  court  determines  that § 2254(e)(2) does not preclude an evidentiary hearing, the court must reexamine whether Wolfe has shown that he is entitled to one. If such a hearing is warranted, the court should resolve any factual disputes bearing on the procedural *Schlup* issue and the substantive *Brady* and *Giglio* claims.[44]

## IV.

Pursuant to the foregoing, we affirm the district court's rejection of the extraneous influence claim and the counsel subpart of the venireman claim. On the other hand, we vacate its disposition of the *Brady* and *Giglio* claims, as well as its ruling on the court subpart of the venireman claim. Finally, we remand for a determination of whether an evidentiary

---

[43]On the first *Townsend* factor, the showing of actual innocence presented by the Barber, Huff, and Coleman Affidavits was not resolved in Wolfe's state proceedings; on the fourth factor — for the same reason — the facts presented constitute a substantial allegation of newly discovered evidence; and, finally, on the fifth factor, the material facts contained in the Appendix were not adequately developed at the state hearing.

[44]On remand, the district court is, of course, free to revisit any of its rulings on the vacated claims, as well as on any related procedural issues. If the court determines that *Schlup* is satisfied on the existing record, any evidentiary hearing and discovery proceedings may relate primarily to the merits of Wolfe's substantive claims. Such matters, however, are reserved, in the first instance, to the district court.

hearing and relevant discovery is appropriate; for a resolution of the *Schlup* issue; for a fresh examination, if warranted, of the *Brady* claim (and its subparts), the *Giglio* claim, and the venireman-court subpart; and for such other and further proceedings as may be appropriate.[45]

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[45]Finally, we emphasize that all the remanded issues are, in the first instance, for the district court to address and resolve.