AGEE, Circuit Judge,
dissenting:
The Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”) limits when a federal court may grant habeas relief to a state prisoner. 28 U.S.C. § 2254(d). The majority agrees with Barnes that the North Carolina state courts’ adjudication of his claim satisfies AEDPA’s requirements because it unreasonably applied Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). I disagree, and therefore respectfully dissent.
I.
AEDPA — which requires federal courts to give deference to state court adjudications in close cases involving uncertain Supreme Court precedent — dictates the proper outcome in this case. See Mitchell v. Esparza, 540 U.S. 12, 17, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (per curiam) (“A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous.”). Under AEDPA, a federal court “shall not” grant habeas relief “to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim” “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).[1] The majority opinion acknowledges AEDPA’s constraints only in the abstract, while simultaneously analyzing the case at bar as if it were on direct appeal from the trial. Thus, the majority opinion engages in a first-impression analysis that substitutes “its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly,” a result AEDPA does not permit. See Williams v. Taylor, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Given the centrality of appellate application of AEDPA deference, I begin by reviewing its demands on federal courts examining state court decisions.
A.
Recent Supreme Court opinions addressing § 2254 unfailingly and repeatedly impress upon circuit courts of appeals “the substantial deference that AEDPA requires” federal courts to give to state court adjudications of state prisoner claims. White v. Woodall, 134 S.Ct. at 1701 (observing that § 2254(d)’s limitations are “a *254 provision of law that some federal judges find too confining, but that all federal judges must obey”); Nevada v. Jackson, — U.S. -, 133 S.Ct. 1990, 1994, 186 L.Ed.2d 62 (2013) (per curiam); Burt v. Titlow, — U.S. -, 134 S.Ct. 10, 16, 187 L.Ed.2d 348 (2013) (“AEDPA erects a formidable barrier to federal habeas relief for [state] prisoners.”); Greene v. Fisher, — U.S. -, 132 S.Ct. 38, 43, 181 L.Ed.2d 336 (2011) (observing that AEDPA’s standard is “difficult to meet, because [its purpose] is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction” (internal quotation marks omitted)); Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (“A state court must be granted a deference and latitude that are not in operation when the case involves review under” direct review.); Renico v. Lett, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (explaining that AEDPA “ ‘demands that state-court decisions be given the benefit of the doubt’ ”) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)). The Supreme Court has also warned against “collapsing the distinction between ‘an unreasonable application of federal law’ and ... ‘an incorrect or erroneous application of federal law.’” Jackson, 133 S.Ct. at 1994 (quoting Williams, 529 U.S. at 412, 120 S.Ct. 1495).
A state court’s decision is an “unreasonable application of’ Supreme Court case law if the state court “correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner’s case.” Williams, 529 U.S. at 407-OS, 120 S.Ct. 1495.[2] Limiting the “unreasonable application” prong further, the Supreme Court recently rejected the Fourth Circuit’s additional characterization that a state court could unreasonably apply Supreme Court precedent by “unreasonabl[y] refusing] to extend a legal principle to a new legal context where it should apply.” White, 134 S.Ct. at 1706 (“To the extent the unreasonable-refusal-to-extend rule differs from the one embraced in Williams and reiterated many times since, we reject it. Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court’s precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.”). Moreover, where the Supreme Court has articulated a broader governing principle, courts have “more leeway ... in reaching outcomes in ease-by-case determinations” than where the Court has articulated a narrower rule. Harrington, 131 S.Ct. at 786 (internal alteration and quotation marks omitted).
AEDPA deference to state court decisions means that “a federal habeas court may overturn a state court’s application of clearly established federal law only if it is so erroneous that ‘there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court’s precedents.’” Jackson, 133 S.Ct. at 1992 (quoting Harrington, 131 S.Ct. at 786); see also White, 134 S.Ct. at 1697 (“The critical point is that relief is available under § 2254(d)(l)’s unreasonable-application clause if, and only if, it is *255 so obvious that a clearly established rule applies to a given set of facts that there could be no ‘fairminded disagreement’ on the question.”). And in undertaking its review, a federal court is not constrained by the state court’s express reasoning, but instead “must determine what arguments or theories supported or, as here, could have supported, the state court’s decision.” Harrington, 131 S.Ct. at 786. Although the majority opinion fleetingly purports to apply AEDPA deference, it in truth simply disagrees with an interpretation of Remmer that would allow the state court to conclude that the conversation alleged to have occurred here was not about a “matter pending before the jury.” Cf. Maj. Op. at 249. In doing so, the majority opinion “disregards perfectly reasonable interpretations [of Supreme Court precedent] and hence contravenes § 2254(d)’s deferential standard of review.” See White, 134 S.Ct. at 1706.
B.
Through the applicable AEDPA lens, then, I consider the North Carolina courts’ decisions denying Barnes a presumption of prejudice or an evidentiary hearing in light of his allegation that a juror communicated with her pastor during sentencing deliberations. This inquiry entails examining the context and nature of Barnes’ allegations as well as the applicable Supreme Court precedent.
During closing arguments for the sentencing phase of Barnes and his co-defendants’ trial, one co-defendant’s attorney told any “true believers” on the jury that “all of us will stand in judgment [before God] one day.” The attorney urged the jurors to consider their judgment day before God and whether God would praise them for not violating His commands— including “Thou shalt not kill” — even if the state authorized sentencing a person to death. (J.A. 1532-33.) The defense argument about the eternal consequences to the jury’s decision left several jurors visibly affected and, in one juror’s words, “furious.” (J.A. 1900.) For reasons unexplained in the record and only speculated to during oral argument, the prosecution did not object to this argument.
Following the jury’s deliberations and recommendation that Barnes be sentenced to death, Barnes’ attorney informed the trial court that he had been apprised that one juror had spoken to “a member of the clergy” during the trial “about a particular question as to the death penalty.” (J.A. 1602.) Because Barnes had no evidence that the juror discussed “the particular facts of this case with anybody outside the jury,” the trial court did not allow the jurors to be questioned about this incident and denied Barnes’ motion for a new trial. (J.A. 1602-03.)
Barnes argued on direct appeal that the trial court abused its discretion by denying his motion and not investigating this allegation of juror misconduct. The North Carolina Supreme Court assumed that Barnes’ allegations regarding third-party contact were true, but concluded that the trial court had not abused its discretion when confronted by a “mere unsubstantiated allegation” that did not call into question “the fairness or impartiality of the juror.” (J.A. 1854-55.) In particular, the North Carolina Supreme Court noted the absence of evidence that the communication “prejudiced [Barnes] or that the juror gained access to improper or prejudicial matters and considered them with regard to this case.” (J.A. 1855.)
When filing his North Carolina Motion for Appropriate Relief (“MAR”), Barnes attached several affidavits and an interview summary purporting to support his claim of “juror misconduct and extraneous influences on the jury.” (J.A. 1882.) An *256 affidavit from Barnes’ private investigator averred that juror Hollie Jordan told him she believed that the co-defendant’s attorney had “quot[ed] scripture out of context” when he asserted “the jurors would one day face judgment for their actions” if they sentenced the defendants to death. She “called her pastor” and “discussed the lawyer’s argument with” him, during which time the pastor informed her of “another biblical passage which contradicted the passage relied upon by the defense attorney.” (J.A. 1892.) On the day of her interview with the private investigator, Ms. Jordan signed an interview summary that does not mention any conversation with her pastor. Instead, Ms. Jordan’s signed statement says that she was troubled by the co-defendant’s attorney’s argument, and that she “brought a Bible from home into the jury deliberation!],] she read an unspecified passage from the Bible stating that it is the duty of Christians to abide by the laws of the state[, and that she] knew the passage from church.” (J.A. 1898.)[3]
Several other jurors recalled that one or more jurors read from the Bible during the course of the jury’s deliberations. None of the jurors could remember the verses read, but some of them recalled that they at least in part related to the co-defendant’s attorney’s troubling closing argument, and “dealt with life and death.”, A few jurors also recalled that a juror had talked to her pastor during the proceedings. (J.A. 1892-93,1900,1902-03.)
The North Carolina MAR court denied Barnes’ claims as “proeedurally barred and without merit,” explaining that the evidence acquired after the direct appeal did not alter the nature of Barnes’ claims, which were “subject to the same analysis inherent in the [North Carolina Supreme Court’s] decision.” (J.A. 1883.)
Barnes thereafter timely filed a § 2254 petition for a writ of habeas corpus in the U.S. District Court for the Middle District of North Carolina. Relevant to this appeal, Barnes once again alleged that juror misconduct during the sentencing deliberations violated his due process rights. Specifically, he asserted that a juror improperly asked her pastor for advice “about the biblical correctness of a defense closing argument” (J.A. 1631), that the juror then improperly tainted the jury deliberation by reading Bible verses to other jurors, and that the state court erred by not granting Barnes a presumption of prejudice or conducting an evidentiary hearing to establish the prejudicial effect of these incidents. (J.A. 1627-40.) The district court denied Barnes’ petition, but granted a certificate of appealability “with respect to the issue whether a juror’s contact with her pastor violated [his] Sixth Amendment right to a fair trial.” (J.A. 2181.)[4]
C.
Barnes alleges, as he did below, that the state courts unreasonably applied Supreme *257 Court precedent by denying him a presumption of prejudice arising from the juror’s conversation with her pastor. He asserts that this conversation “constituted an impermissible external influence on the deliberating jury,” which entitles him to a new sentencing hearing. (Opening Br. 18.) In the alternative, he asserts that the state courts unreasonably applied Supreme Court precedent by denying him the opportunity to prove actual prejudice at an evidentiary hearing.
The Sixth Amendment’s due process right to a jury trial encompasses being tried “by a panel of impartial, indifferent jurors.” Turner v. Louisiana, 379 U.S. 466, 471, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (internal quotation marks omitted). And “[t]he failure to accord an accused a fair hearing violates even the minimal standards of due process.” Id. at 471-72, 85 S.Ct. 546. This constitutional concern forms the basis for a limited exception to “the near-universal and firmly established common-law rule in the United States [that] flatly prohibits] the admission of juror testimony to impeach a jury verdict.” Tanner v. United States, 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987). The exception permits juror testimony regarding “whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror.” Id. at 121,107 S.Ct. 2739 (quoting Federal Rule of Evidence 606(b)).[5]
Barnes’ allegations fall within two overlapping sets of Supreme Court cases related to this narrow exception: those dealing with third-party contact during a trial and those dealing with juror misconduct during a trial. See Smith v. Phillips, 455 U.S. 209, 221-22, 102 S.Ct. 940, 71 L.Ed.2d 78 (1984) (O’Connor, J., concurring).[6] That said, the Supreme Court has considered claims based on jury bias arising from third-party contact during the course of a trial in only a handful of cases.
The cornerstone of Barnes’ argument rests on Remmer, in which the Supreme Court considered what due process required when Remmer alleged an improper external influence on a juror arising from a third-party telling the juror he “could profit by bringing in a verdict favorable to” one party. 347 U.S. at 228, 74 S.Ct. 450. The juror told the trial court about this contact, and the trial court reported the contact to the Federal Bureau of Investigation, which investigated the matter further. Id. Remmer moved for a new trial, alleging that this external contact with the juror deprived him of a fair trial. Id. at 229, 74 S.Ct. 450. The district court denied the motion without holding a hearing *258 (which Remmer had requested) to examine the interaction and its effect. Id. The Supreme Court remanded the case for an evidentiary hearing, stating:
In a criminal case, any private communication, contact, or tampering, directly or indirectly with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
Id. The Supreme Court observed that the record before it did not reflect “what actually transpired, or whether the incidents that may have occurred were harmful or harmless,” so a hearing was necessary. Id. It vacated the lower court’s judgment and remanded the case to the district court for a hearing. Id. at 230, 74 S.Ct. 450.
In Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam), the Supreme Court held that a defendant was entitled to a new trial because a bailiff had stated to or in the presence of one or more jurors that the defendant was a “wicked fellow” and “guilty,” and that “[i]f there [was] anything wrong [in convicting him,] the Supreme Court [would] correct it.” Id. at 363-64, 87 S.Ct. 468. The Supreme Court observed that this communication implicated the defendant’s constitutional rights to be tried by an impartial jury and to confront the witnesses against him. Id. at 364, 87 S.Ct. 468. And it concluded that the communication was prejudicial because the bailiff was an officer of the court and the state, had “shepherded] [the jury] for eight days and nights,” and made statements “involving] such a probability that prejudice will result that it is deemed inherently lacking in due process.” Id. at 365, 87 S.Ct. 468.
In Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the Supreme Court considered a different type of third-party influence on the jury’s deliberation: two deputy sheriffs were both “principal witnesses for the prosecution” at the trial and charged with keeping the jury sequestered. Id. at 467-68, 85 S.Ct. 546. The court explained that the latter “meant that the jurors were continuously in the company of [these witnesses and other sheriff deputies] during the three days that the trial lasted. [They] drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them.” Id. at 468, 85 S.Ct. 546. Although the evidence did not indicate that the deputies discussed the case with the jurors while discharging these duties, id. at 469, 473, 85 S.Ct. 546, the Supreme Court nonetheless held that this interaction unconstitutionally tainted the proceedings. Id. at 472-73, 85 S.Ct. 546. The Court explained:
even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial — an association which gave these witnesses an opportunity ... to renew old friendships and make new acquaintances among the members of the jury.
Id. at 473, 85 S.Ct. 546.
Most recently, in Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 *259 (1982), the Supreme Court rejected a petitioner’s argument that he was entitled to a new trial after a juror submitted an employment application to the prosecutor’s office during the course of the trial. The Court noted that in Remmer, the “attempted bribe, which [was] ‘presumptively prejudicial,’ [coupled with] the undisclosed investigation, which was ‘bound to impress the juror’ ” required a hearing at which the parties could determine the prejudicial impact of these events. Id. at 215-16, 102 S.Ct. 940. However, the Court observed that “shielding] jurors from every contact or influence that might theoretically affect their vote,” was “virtually impossible,” and held that a new trial was unnecessary each time such an allegation or incident occurred. Id. at 217, 102 S.Ct. 940. Instead, the Supreme Court reiterated that a hearing — such as the one the trial court held in that case — could ensure the jury decided the case based “solely on the evidence before it” and did not prejudice the defendant. Id.
While Barnes’ argument regarding “clearly established Supreme Court” case law rests on Remmer, each of the above Supreme Court cases informs how that precedent has been applied and how a court should assess allegations of juror misconduct or third-party influence during a trial. I agree with the majority that Remmer is clearly established Supreme Court precedent, but after reviewing Barnes’ claims under the AEDPA standards of review, I conclude that the North Carolina state courts did not unreasonably apply Remmer.
D.
Analyzing Remmer’s applicability to the case at bar requires first looking to what the Supreme Court set forth as the component parts of its rule, that being: “In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptive prejudicial” except under circumstances not relevant here. 347 U.S. at 229, 74 S.Ct. 450 (emphasis added). Read in the context of the Supreme Court’s actual holding, Remmer ’s broad reference to “any private communication, contact, or tampering” is immediately constricted by the narrowing clause “about the matter pending before the jury.” This limitation makes sense given that the Remmer presumption flows from the narrow exception to the common law prohibition — now expressed in the rules of evidence — against soliciting juror testimony to impeach the verdict.[7] See Robinson, 438 F.3d at 359-61 (discussing these principles); Stockton v. Virginia, 852 F.2d 740, 743-44 (4th Cir.1988) (same). Whatever Remmer’s scope, then, it must be understood as part of a limited exception to the normal rules governing the finality of the verdict and prohibiting courts from entertaining post-judgment evidence to impeach the jury’s verdict.
As the majority opinion correctly recognizes, not every third-party contact impli *260 cates Remmer’s presumption of prejudice. Supra Maj. Op. at 244-46. See, e.g., United States v. Blauvelt, 638 F.3d 281, 294-95 (4th Cir.2011) (holding, on direct review, that third-party contact between a juror and prosecutor unaffiliated with the case during the course of the trial was “inadvertent and innocuous” and thus did not trigger Remmer’s presumption even though the juror mentioned her jury service and expressed new-found respect for the prosecutor’s job); Wolfe v. Johnson, 565 F.3d 140, 162 (4th Cir.2009) (holding, in § 2254(d) context, that the state court did not unreasonably apply Remmer in concluding Wolfe failed to show that a juror’s numerous telephone conversations during the course of jury deliberations constituted an impermissible external jury influence). In applying Remmer in previous cases, this Court has held that in order to trigger Remmer’s presumption, “a § 2254 petitioner must show both that an ‘unauthorized contact was made and, that it was of such a character as reasonably to draw into question the integrity of the verdict.’ ” Wolfe, 565 F.3d at 162 (internal quotation marks omitted) (emphasis added).
Significantly, neither Remmer nor any subsequent Supreme Court case has elaborated on when interaction between a juror and third party is “about the matter pending before the jury.” An area undefined by the Supreme Court thus exists between the general principle espoused in Remmer and acceptable interpretations — including limitations — of it. Rather than calling those parameters into question in the first instance, under AEDPA, the Court may only grant relief if the state courts’ conclusion that Barnes’ allegations fell outside Remmer’s scope was “unreasonable.” And in examining that question, AEDPA does not permit this Court to equate a conclusion that the state’s application of Remmer is incorrect to its being unreasonable. See, e.g., Jackson, 133 S.Ct. at 1994.
The majority opinion concludes that the communication alleged here satisfies Remmer because “the spiritual or moral implications of’ deciding whether to impose death “clearly” related to “the matter pending before the jury.” Maj. Op. at 249. However, it offers no substantive basis for this conclusion grounded in Supreme Court precedent, nor does it grapple with arguments or theories that could have supported the state court’s decision to the contrary. In so doing, the majority opinion treats the issue before us as if it were here on direct appeal from the trial court and not a § 2254 petition constrained by AEDPA. The majority opinion thus fails to undertake the appropriate review under AEDPA, see Harrington, 131 S.Ct. at 786, and fails to recognize the lack of clearly established Supreme Court case law mandating the interpretation of Remmer that it adopts. In doing so, the majority transgresses the Supreme Court’s admonition in Jackson against “collapsing the distinction between an unreasonable application of federal law” and what the majority now views as “an incorrect or erroneous application of federal law.” 133 S.Ct. at 1994 (quoting Williams, 529 U.S. at 412, 120 S.Ct. 1495); see also Harrington, 131 S.Ct. at 786 (“It bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.”).
To determine what constraints Remmer posed generally — and specifically what reasonable interpretations of “the matter pending before the jury” might exist — -I return to the controlling Supreme Court case law, beginning with Remmer. When that case returned to the Supreme Court, the Supreme Court explained that the earlier remand for an evidentiary hearing had been necessary because of “the paucity of *261 information relating to the entire situation coupled with the presumption which attaches to the kind of facts alleged by petitioner^ ” Remmer v. United States, 350 U.S. 377, 379-80, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (emphasis added). In light of the plain language in both Remmer decisions describing why the presumption and hearing were necessary in that case, it would not be “objectively unreasonable” for the state court to limit the scope of “the matter pending before the jury” to communication or contact suggesting how the juror should vote in a particular case.
The majority correctly posits that a state court may unreasonably apply Supreme Court precedent even where the Supreme Court has not issued an opinion involving a nearly identical fact pattern. See Maj. Op. at 246. Federal courts can grant habeas relief when state court adjudications are either “contrary to” or “unreasonable applieation[s] of’ clearly established Supreme Court precedent, § 2254(d)(1). The point, however, is that to prevail under § 2254, a petitioner must show more than just the misapplication of Supreme Court precedent or an erroneous decision. As set out earlier, AEDPA mandates a much higher bar, and where the Supreme Court has not spoken on a particular aspect of a claim, more room exists for a state court’s adjudication of the claim to be reasonable. See, e.g., White, 134 S.Ct. at 1697 (observing that “where the precise contours of [a] right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner’s claims” (internal quotation marks omitted)); Renico, 559 U.S. at 773-79, 130 S.Ct. 1855 (applying this standard where the state court and circuit court of appeals offered conflicting interpretations of the record, both of which were “reasonable” and concluding that the state court’s adjudication was therefore not objectively unreasonable); Mitchell, 540 U.S. at 17-18, 124 S.Ct. 7 (discussing and applying why an erroneous state court decision is not an objectively unreasonable state court decision). Cf. supra at [2-5]. Applied to this case, it is a far cry from limiting Remmer to a nearly identical factual scenario (i.e., a potential bribe) to conclude that whatever defines the proper scope of “the matter pending before the jury,” it does not extend to the allegations at issue here.
Returning to the actual allegations contained in Barnes’ affidavits,[8] the only contact alleged to occur between the juror and her pastor is a conversation regarding whether jurors would face judgment from God if they sentenced someone to death. (J.A. 1892.) Nowhere in the affidavits supporting his claim does Barnes suggest that the pastor expressed his views of the death penalty either generally or as applied to this case. Neither do the affidavits support the claim that the pastor attempted to persuade the juror to vote for or against the death penalty, suggested that the Bible supported a particular sentence in this case, or exposed the juror to *262 any extraneous information relevant to the juror’s deliberative process. Rather, the substantive allegation in the affidavit regarding the juror’s communication with her pastor is that the pastor provided the juror with a Bible verse that “contradicted the passage relied upon by the defense attorney,” which had “suggested that if jurors returned a death sentence, they, the jurors would one day face judgment for their actions.” (J.A. 1892.)[9]
Numerous times throughout his § 2254 petition Barnes acknowledges that it is this issue — not the jury’s choice of the appropriate sentence — which was the subject of the third-party contact. E.g., J.A. 1627 (“[A]n attorney for one of the codefendants told the jury that sentencing a defendant to death would violate God’s law and, perhaps, subject the jurors to judgment one day. In response to this argument, one of the jurors ... telephoned] her pastor and [sought] his advice about this argument. He referred her to a biblical passage that he claimed refuted the argument.” (emphasis added)); 1629 (“[A] lawyer argued the jurors might themselves be judged by God if they returned a sentence of death.... In response to this argument, [a juror] contacted her pastor ... and discussed it. [The pastor] gave her a biblical passage that he felt responded to the argument.” (emphasis added)); 1631 (“[A] sitting juror ... call[ed] her pastor during the sentencing deliberations and asked his advice about the biblical correctness of a defense closing argument. The pastor referred her to a passage [he] claimed refuted the argument.” (emphasis added)). While Barnes also speculates and theorizes as to how the conversation impacted the deliberative process, he reaches far beyond the scope of the evidence before the state MAR court at the time it reviewed his claim in so doing. E.g., J.A. 1633-34 (asserting, among other things, that the pastor provided his view on the biblical support for the death penalty and gave the juror the “green light” to vote for death).
The North Carolina state MAR court could reasonably conclude that the type of communication at issue here did not constitute contact “about the matter pending before the jury” because it was not directed to the choice of sentence, life in prison or death, that the jury was ultimately charged to determine. And Barnes’ allegations can fairly be read as asserting that the juror and her pastor conversed about the religious implications of serving on a jury, or even serving on a jury in a capital case, but not about the appropriateness of any specific sentencing choice that the jury was charged to make regarding Barnes. Therefore, a fair-minded jurist could conclude that this type of communication was *263 not “about the matter pending before the jury” under Remmer.[10]
In a similar vein, it would be objectively reasonable to view the “matter pending before the jury” as the state trial court’s charge to the jurors to determine whether the appropriate sentence for Barnes under North Carolina law was life imprisonment or the death penalty. At no time did the state trial court charge jurors with deciding the eternal consequences to their soul that they could face as a result of following the court’s instructions in making their sentencing decision. The provocative closing argument of Barnes’ co-defendant did not alter “the matter” actually before the jury as instructed by the state trial court. Moreover, as the district court noted, the communication Barnes’ affidavits allege to have occurred “expressed no opinion on the propriety of the death penalty and simply indicated that a Christian has a duty to follow the laws of the state, which, in the case of North Carolina, permitted a jury, in its discretion, to recommend that a convicted murderer like Barnes serve life in prison or be put to death[.]” Dist. Ct. Op. at J.A. 2143-44. Consequently, fair minded jurists can disagree as to whether the contact alleged in this case falls within Remmer’s scope of contacts and communication “about a matter pending before the jury.” As such, I do not believe that Barnes can point to Remmer’s own parameters to satisfy his burden under AEDPA.[11]
*264 The other Supreme Court decisions discussed above do not alter the conclusion that the state courts reasonably applied Remmer. As noted, neither Parker nor Remmer specifically expounded on the Remmer presumption even though they involved juror partiality claims. Parker, like Remmer, entailed third-party communication urging that jurors cast their vote in a particular manner. See Parker, 385 U.S. at 363-64, 87 S.Ct. 468. Turner is also readily distinguishable: even though the defendant did not allege that the two witness-deputies specifically spoke about the case with the jurors during their close interactions facilitating the jury’s sequestration, the Court’s concern arose from these deputies being key prosecution witnesses in the case. Interaction of this duration, proximity, and intimacy between trial witnesses and jurors tainted the proceedings in a way that a single conversation with a non-witness would not inherently involve. See Turner, 379 U.S. at 474, 85 S.Ct. 546 (“It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were not deputy sheriffs. But the role that [they] played as deputies made the association even more prejudicial .... Turner’s fate depended upon how much confidence the jury placed in these two witnesses.”). Indeed, Turner did not rely directly on Remmer. For these reasons, Turner does not govern the state courts’ adjudication of Barnes’ claim.
Lastly, Smith — the only of these cases directly relying on Remmer — also involved an entirely different potential influence on a juror’s decision making than that at issue here. The petitioner in Smith alleged that a juror was implicitly biased because he had submitted an employment application with the prosecutor’s office during the trial. Relevant to this case, Smith reiterated that the due process concern was in maintaining “a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.” 455 U.S. at 217, 102 S.Ct. 940. Because Smith involved a juror’s implied, internal bias rather than prejudice arising from specific third-party contact, it did not refine Remmer’s guidance regarding what type of communication is “about the matter pending before the jury” or when the Remmer presumption is invoked as a result of such contact.
In short, none of these cases alters the basic proposition contained in Remmer regarding what sort of communication comprises “the matter pending before the jury.” For these reasons, I conclude that the North Carolina state courts could reasonably conclude that the communication alleged here was not “about the matter pending before the jury” such that it triggered Remmer’s presumption of prejudice. And because the state courts could reasonably conclude that the Remmer presumption did not apply to Barnes’ claims, they did not err in denying him an evidentiary hearing.
E.
I believe the majority’s analysis with respect to Barnes’ evidentiary hearing claim suffers from other analytical errors as well. The majority concludes that the state courts “greatly distorted Barnes’ burden, requiring” him to “present evidence that a juror was actually biased and that Barnes was therefore actually preju *265 diced by the unauthorized communication.” Maj. Op. at 248. This conclusion misses the point underlying the state courts’ denial of Barnes’ claims in several ways.
First, the state MAR court did not mention prejudice in its brief analysis of this issue. Instead, it concluded that the issue was procedurally barred and lacked merit because Barnes’ new evidence “add[ed] nothing to the issue as it was presented during [his] original appeal, and the allegations are subject to the same analysis inherent in that decision.” (J.A. 1888.) The state MAR court did not require more of Barnes than Remmer demands, nor did it distort the appropriate analysis.
To the extent it adopted the North Carolina State Court’s view, that court’s statements regarding the lack of prejudice flowed directly from its view of the nature of the communication alleged to have occurred. See J.A. 1854-55; 1882-83.[12] That inquiry is properly part of Barnes’ initial burden of submitting sufficient support for his allegations so as to trigger the protections discussed in Remmer. It was not enough for Barnes to allege “contact between a juror and her pastor,” Barnes also needed to present a credible allegation that this contact was “about a matter pending before the jury.” Denying the Remmer presumption of prejudice or an evidentiary hearing based on the conclusion that the communication alleged did not call into question the integrity of the verdict, i.e., did not concern the “matter pending before the jury,” fully complies with Remmer.
To that end, this Court has previously recognized that it is the petitioner’s initial burden to show prejudicial contact in considering whether Remmer’s presumption of prejudice has been triggered. See Blauvelt, 638 F.3d at 295 (holding that the Remmer presumption did not apply where the communication was innocuous and the defendant “ha[d] failed to present evidence that the communication was prejudicial”); Wolfe, 565 F.3d at 162 (holding that “the state court’s conclusion that Wolfe failed to show a prejudicial influence on the jury’s deliberations was not objectively unreasonable”). The North Carolina state courts thus properly analyzed Barnes’ allegations for their potentially prejudicial nature in order to determine whether they were sufficient to trigger Remmer. Contrast supra Maj. Op. at 248-49 (criticizing the state MAR Court for “demanding] proof of a Sixth Amendment violation' — 'that is, proof of juror bias — before Barnes was entitled to any relief’).
Even more fundamentally, though, under AEDPA, we are not constrained by the state courts’ rationale in assessing whether its holding should nonetheless be upheld. Indeed, the state courts’ decision need not provide any statement of reasons to nonetheless create a presumption that a claim was “adjudicated on the merits” and thus subject to § 2254(d) review. Harrington, 131 S.Ct. at 784-85. Federal courts review the “state court’s determination that a claim lacks merit,” not solely the rationale it provides for that determination. See id. at 786; see also Wolfe, 565 F.3d at 162 (observing that when a state court adjudicates a claim on the merits, *266 federal courts must apply AEDPA’s deferential standard of review to the decision, even when the court does not set forth the legal principles, precedents, or rationale for its decision); Robinson, 438 F.3d at 358 (“In assessing the reasonableness of the state court’s application of federal law, therefore, the federal courts are to review the result that the state court reached, not whether its decision was well reasoned.” (internal quotation marks and alterations omitted)).
In order for Barnes to prevail, it is not enough for the majority to conclude that the state courts’ analysis erred in considering Barnes’ burden as to prejudice. Rather, the majority needed to consider whether any reading of the record and Remmer could support the decision to deny a presumption of prejudice and evidentiary hearing, even if the state courts’ stated rationale was inadequate or flawed. See Harrington, 131 S.Ct. at 786. AEDPA demands no less.
II.
For the reasons set forth above, I conclude that “fairminded jurists could disagree” as to whether the communication Barnes alleges to have occurred constituted juror contact with a third party “about a matter pending before the jury.” Neither Remmer nor any subsequent Supreme Court case has explored the applicability of the Remmer presumption to allegations that a juror’s conversation with a third party did not directly bear upon how the juror would vote. Given that Remmer expressed only a general principle, and the Supreme Court has recognized that “[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations,” Harrington, 131 S.Ct. at 786,1 believe that AEDPA’s standard of review settles the Court’s inquiry in this case.
If this case was before the Court on a direct appeal, a different analysis would be required to determine whether Barnes could be entitled to any relief under Remmer. But that is not the posture of the case before the Court, and our review under AEDPA is only whether the North Carolina state courts could reasonably conclude that Remmer did not require either a presumption of prejudice or an evidentiary hearing. Given the ambiguities in interpreting what constitutes a “matter pending before the jury” and a reasonable basis for distinguishing the applicable Supreme Court precedent, we are constrained by AEDPA. See Mitchell, 540 U.S. at 18, 124 S.Ct. 7; Robinson, 438 F.3d at 355 (“The state court’s application of clearly established federal law must be ‘objectively unreasonable,’ and ‘a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.’ ” (quoting Williams, 529 U.S. at 411, 120 S.Ct. 1495)).
Because I would hold that the North Carolina state courts did not unreasonably apply Remmer by concluding that the contact alleged in Barnes’ affidavits did not trigger a presumption of prejudice, I would affirm the district court’s denial of Barnes’ § 2254 petition. Accordingly, I respectfully dissent.

. Barnes relies on the "unreasonable application of” component of § 2254(d)(1) rather than the "contrary to” component.

. As the majority opinion notes, a state court's adjudication on the merits “need not cite or even be aware of [Supreme Court] cases” or explain its rationale for this Court to be owed deference under § 2254(d). Harrington, 131 S.Ct. at 784. Even where the state court's decision does not explain its reasoning or does so broadly, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.” Id.

. Juror Jordan's pastor did not recall conversing with Ms. Jordan, but admitted it was possible that he had done so and "simply [did] not remember it.” (J.A. 1893.)

. Barnes continues to press the impropriety of reading the Bible during deliberations inasmuch as he alleges that the juror communicated information originally given to her from her pastor to the jury. To the extent that reading the Bible during deliberations would present a separate claim of juror misconduct, that claim is not properly before this Court. Moreover, the analysis for the juror contact claim turns on the conversation alleged to have occurred between the juror and her pastor, not on what the juror did thereafter. If that communication did not trigger Remmer, then nothing the juror did thereafter would present a different claim than the separate, "reading the Bible during deliberations” claim for which Barnes has not been issued a COA.

. North Carolina Rule of Evidence 606(b) mirrors the federal exception. See N.C. Gen. Stat. § 8C-1, Rule 606(b).

. Allegations of juror misconduct are further broken down into those alleging extraneous juror misconduct and those alleging internal juror misconduct. Although the line between these two types of misconduct is not always clear, the distinction creates important consequences when analyzing a petitioner's claim in light of the applicable evidentiary rules. See Tanner, 483 U.S. at 116-22, 107 S.Ct. 2739 (discussing the common law rule adopted in federal court prohibiting juror testimony on matters affecting the jury's deliberation, and the narrow exception to that rule permitting juror testimony in situations in which an "extraneous influence” is alleged to have affected the jury).
Because Barnes’ claim is now limited to the juror's conversation with her pastor — as opposed to a juror reading the Bible during deliberations — the analysis focuses on precedent relating to extraneous juror misconduct. Cf Robinson v. Polk, 438 F.3d 350, 359-68 (4th Cir.2006) (discussing this distinction in juror misconduct jurisprudence in the context of juror’s use of the Bible during deliberations).

. Federal Rule of Evidence 606(b) states:
During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror’s or another juror’s vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror’s statement on these matters.
There are three exceptions, permitting jurors to testify about whether "extraneous prejudicial information was improperly brought to the jury’s attention”; "an outside influence was improperly brought to bear on any juror”; or "a mistake was made in entering the verdict on the verdict form.”

. I note that the relevant cross-reference should be to the allegations contained in the affidavits because at times Barnes’ briefs on appeal allege a much broader third-party communication than can be reasonably inferred from the contents of the affidavits or his § 2254 petition. At times the majority makes this same error.
For this reason, too, the majority is mistaken in opining that the dissent is "focus[ing] not on what is alleged by Barnes, but rather on what is missing from his allegations.” Maj. Op. at 250. As detailed above, Barnes' affidavits simply do not allege what either Barnes or the majority now claim that they do, and that point is made plain by looking to the actual allegations in those affidavits. What is missing from the affidavits simply highlights the dichotomy between what they do contain and other types of allegations that might bring the claim within Remmer's scope.

. The rest of Barnes’ affidavits merely allege that the juror talked to her pastor (without alleging anything about what the conversation was about) or that jurors read from the Bible during jury deliberations. (J.A. 1892-1903; see also Dist. Ct. Op. at J.A. 2140 n.10.)
With respect to the former, the state court was not obliged to conclude that mere contact with the pastor — absent some attendant factual allegation that it involved communication "about the matter pending before the jury”— warranted either a presumption of prejudice or an evidentiary hearing. Indeed, the majority recognizes as much. But we arrive at different conclusions based on our different views of how to approach the state courts’ interpretation of Barnes’ evidence in light of Remmer.
With respect to the jurors reading from the Bible, these allegations are not before the Court as they are not part of the certificate of appealability. To the extent that Barnes alleges further prejudice arising from the juror’s subsequent conversations during deliberations, that would be mere surplusage as improper third-party contact with even one juror would be sufficient to trigger Remmer's presumption, if that contact had otherwise fallen within Remmer's scope.

. The majority opinion posits that because the trial court did not instruct the jurors to disregard the closing argument, it was "squarely presented for the jury's consideration as part of their ultimate sentencing decision.” Maj. Op. at 249. Closing argument is not evidence, however. And while the jury instructions are not part of the joint appendix before this Court, the sentencing trial proceeded in accordance with the then-applicable provisions of N.C. Gen.Stat. § 15A-2000, which delineates specific criteria — based on the evidence presented to the jury — that the jurors are to use in deciding the appropriate sentence. See North Carolina v. Barnes, 345 N.C. 184, 481 S.E.2d 44, 51 (1997) (describing Barnes’ sentencing as proceeding "pursuant to” N.C. Gen.Stat. § 15A-2000).

. Notably, this Court's precedent would also permit such a reading of Remmer’s "matter pending before the jury” language. In each instance where we have invoked the Remmer presumption following third-party communication with a juror, jurors encountered third parties who expressed their view of a party's culpability or appropriate sentence. E.g., Fullwood v. Lee, 290 F.3d 663, 676-84 (4th Cir.2002) (remanding for an evidentiary hearing in a § 2254(d)(1) case where the petitioner proffered evidence that a juror’s “strongly pro-death penalty” husband had repeatedly attempted to influence his wife to convict the petitioner and sentence him to death); United States v. Cheek, 94 F.3d 136, 140-44 (4th Cir. 1996) (reversing and remanding for a new trial based on the Remmer presumption based on juror-third party contact the Court characterized as the juror's correct perception that the third party was attempting to bribe him); Stockton, 852 F.2d at 745-46 (holding that a third party's statement to jurors that he hoped "[they] fr[ied] the son-of-a-bitch” "bore on the exact issue — whether to impose the death penalty — -that the jurors were deliberating at that time”); Stephens v. South Atlantic Canners, Inc., 848 F.2d 484, 487-89 (4th Cir.1988) (invoking Remmer's presumption where the jury was exposed to statements from an individual who had been "inadvertently placed on [the] jury panel” during the first day of trial, "that he knew from his own experience that the plaintiff's testimony was correct and that he would vote to return a verdict against the defendants”); Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1534-38 (4th Cir.1986) (invoking Remmer’s presumption where the jury was exposed to statements from a nonjuror who had inadvertently sat on the jury during the first day of trial that he would " 'be against the company’ regardless of the evidence” given his personal familiarity with trucking companies). See also United States v. Basham, 561 F.3d 302 (4th Cir.2009) (affirming district court's conclusion that the Government had rebutted the Remmer presumption of prejudice where juror was alleged to have telephoned multiple media outlets to provide information on the *264 penalty phase deliberations). While these cases do not mean that Remmer could not be read more broadly, they equally support the view that Remmer could also reasonably be limited to such circumstances.

. The North Carolina Supreme Court held that “[t]he trial court was faced with the mere unsubstantiated allegation that a juror called a minister to ask a question about the death penalty. Nothing in this assertion involved ‘extraneous information' as contemplated in our Rule 606(b) or dealt with the fairness or impartiality of the juror. There is no evidence that the content of any such possible discussion prejudiced defendants or that the juror gained access to improper or prejudicial matters and considered them with regard to this case.” (J.A. 1854-55.)